**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2518 (JBS) |
| v. | : | |
| | : | |
| NEW JERSEY STATE POLICE, et al., | : | **OPINION** |
| | : | **APPLIES TO ALL ACTIONS** |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2519 (JBS) |
| v. | : | |
| | : | |
| PENNSVILLE, et al., | : | |
| | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2520 (JBS) |
| v. | : | |
| | : | |
| MOUNT LAUREL, et al., | : | |
| | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2521 (JBS) |
| v. | : | |
| | : | |
| WESTAMPTON, et al., | : | |
| | : | |
| Defendants. | : | |

. . . continued

|  |  |  |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2522 (JBS) |
| v. | : | |
| | : | |
| WILLINGBORO, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| SHYAAM M.K. EL , | : | |
| | : | |
| Petitioner, | : | Civil Action No. 09-3371 (JBS) |
| v. | : | |
| | : | |
| RONALD COX, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |
| SHYAAM EL M.K. , | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-3372 (JBS) |
| v. | : | |
| | : | |
| RONALD COX, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-3392 (JBS) |
| v. | : | |
| | : | |
| WILLINGBORO, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

. . . continued

```
                                          :
MARRAKUSH SOCIETY,                        :
                                          :
                Plaintiff,                :     Civil Action No. 09-3441 (JBS)
           v.                             :
                                          :
WESTAMPTON, et al.,                       :
                                          :
                Defendants.               :
                                          :
```

```
                                          :
MARRAKUSH SOCIETY,                        :
                                          :
                Plaintiff,                :     Civil Action No. 09-3442 (JBS)
           v.                             :
                                          :
WESTAMPTON, et al.,                       :
                                          :
                Defendants.               :
                                          :
```

```
                                          :
MARRAKUSH SOCIETY,                        :
                                          :
                Plaintiff,                :     Civil Action No. 09-3502 (JBS)
           v.                             :
                                          :
PENNSVILLE, et al.,                       :
                                          :
                Defendants.               :
                                          :
```

```
                                          :
MARRAKUSH SOCIETY,                        :
                                          :
                Plaintiff,                :     Civil Action No. 09-3503 (JBS)
           v.                             :
                                          :
WILLINGBORO, et al.,                      :
                                          :
                Defendants.               :
                                          :
```

. . . continued

```
_____  :
                         :
MARRAKUSH SOCIETY,       :
                         :
              Plaintiff, :    Civil Action No. 09-3504 (JBS)
         v.              :
                         :
BURLINGTON COUNTY JAIL, et al., :
                         :
              Defendants. :
_____  :
                         :
MARRAKUSH SOCIETY,       :
                         :
              Plaintiff, :    Civil Action No. 09-3505 (JBS)
         v.              :
                         :
MANSFIELD, et al.,       :
                         :
              Defendants. :
                         :
_____  :
                         :
MARRAKUSH SOCIETY,       :
                         :
              Plaintiff, :    Civil Action No. 09-3506 (JBS)
         v.              :
                         :
SUPERIOR COURT, et al.,  :
                         :
              Defendants. :
_____  :
                         :
MARRAKUSH SOCIETY,       :
                         :
              Plaintiff, :    Civil Action No. 09-3507 (JBS)
         v.              :
                         :
MOUNT LAUREL, et al.,    :
                         :
              Defendants. :
_____  :
```

. . . continued

| | | |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-3589 (JBS) |
| v. | : | |
| | : | |
| VINELAND, et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-3590 (JBS) |
| v. | : | |
| | : | |
| NEW JERSEY STATE POLICE, et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| MARRAKUSH SOCIETY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-3591 (JBS) |
| v. | : | |
| | : | |
| NEWFIELD, et al., | : | |
| | : | |
| Defendants. | : | |

**OPINION (APPLIES TO ALL ACTIONS)**

TABLE OF CONTENTS

I.       Introduction
II.      Marrakush Society and Aboriginal Law Firm
         A.       Marrakush Society
         B.       Aboriginal Law Firm
                  1.       Main Website
                  2.       MySpace Webpage
                  3.       Twitter Webpage
                  4.       Ning Webpage and YouTube Videos
III.     Federal Litigations Initiated by Plaintiffs
         A.       The List of Known Litigations Initiated by Plaintiffs
         B.       Substantive and Procedural Aspects of Plaintiffs' Actions
                  1.       Cases Filed in Other Districts
                           a.       Florida Actions
                                    i.       Florida Action - I
                                    ii.      Florida Action - II
                                    iii.     Florida Action - III
                                    iv.      Florida Action - IV
                                    v.       Florida Action - V
                                    vi.      Florida Action - VI
                           b.       Delaware Action
                           c.       New York Action
                  2.       Plaintiffs' Matters Initiated in this District
                           a.       Actions Styled as Habeas Applications
                                    i.       Civil Action No. 09-3372
                                    ii.      Civil Action No. 09-3371
                           b.       Willingboro Cluster of Actions
                                    i.       Civil Action No. 09-2522
                                    ii.      Civil Action No. 09-3503
                                    iii.     Civil Action No. 09-3392
                           c.       Westampton Cluster of Actions
                                    i.       Civil Action No. 09-2521
                                    ii.      Civil Action No. 09-3342
                                    iii.     Civil Action No. 09-3341
                           d.       Pensville Set of Actions
                                    i.       Civil Action No. 09-3342

           ii.     Civil Action No. 09-3502

    e.     Mount Laurel Set of Actions

           i.     Civil Action No. 09-2520

           ii.     Civil Action No. 09-3507

    f.     Mansfield Set of Actions

           i.     Civil Action No. 09-2518

           ii.     Civil Action No. 09-3505

    g.     Non-duplicative Pleadings Styled as Civil Rights Allegations

           i.     Civil Action No. 09-3504

           ii.     Civil Action No. 09-3506

           iii.    Bey Line of Cases

IV.    Summary of Deficiencies of the Matters Before the Court

V.    Guidance with Respect to Civil Actions

    A.     Proceeding in Forma Pauperis

    B.     Representation by Legal Counsel

    C.     Actual Existence of Litigant and Standing to Sue in One's Own Behalf

    D.     Standing to Bring a Jus Tertii Claim

    E.     Effect of Rules 18 and 20

    F.     Duplicative Actions

    G.     Pleading Requirements

    H.     Initiation of Criminal Prosecution

VI.    Guidance with Respect to Habeas Actions

    A.     "In Custody" Requirement

    B.     Exhaustion Requirement

    C.     Pleading Requirements and Abuse of Writ

    D.     Prohibition Against Recreational Litigation

VII.   Conclusion

**Jerome B. Simandle**, District Judge:

This Opinion addresses concerns raised by commencement of the above-captioned civil and habeas matters. While the immediate legal issues presented by the above-captioned cluster of actions are simple, the concerns associated with the influx of these actions are great and, thus, warrant a detailed discussion of the litigants, their purported counsel and their litigation practices.

I.   **INTRODUCTION**

The above-captioned nineteen actions appear to be a part of the influx of civil cases initiated over the recent months by the same group of litigants in various federal courts. The bulk of the documents submitted in the matters before this Court were signed by two litigants, one of whom refers to himself as "Noble Æmer Shyaam M.K. El" ("M.K."), and another who refers to himself as "Noble Æmer Shyaam K.S. El" ("K.S"),[1] although three matters include documents signed by someone who refers to himself as "Universal Supreme Allah Bey" ("Bey").[2]

_____

[1]  It is not clear that these litigants are using their legal names.  The Court has no certainty that "Shyaam" is an actual first name of either M.K. or K.S.  Rather, it appears that "Shyaam" is an assumed alias, perhaps presenting a variation of the word "Shyam," which is one of 108 names for Krishna. See <<http://www.iloveindia.com/spirituality/gods/krishna/krishna-names. html>>.  Similarly, "El" does not appear to be an actual last name of either M.K. or K.S.; rather, it seems to be a self-added suffix indicating M.K. and/or K.S.'s belief as to their ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent.  See infra note 5 (quoting the decision by the Court of Appeals for the Seventh Circuit, which detailed the distinction between the "Bey"-suffixed  Moors and "El"-suffixed Moors).  Finally, the phrase "Noble Æmer" appears to be not a name but a fictitious self-granted title.  See <<http://www.merriam-webster.com/disctionary/ emir>> (clarifying that the word "emir" means "a ruler, chief, or commander in Islamic countries"); see also <<http://www.britannica.com/EBchecked/topic/185879/emir>> (explaining that, in the Muslim Middle East, the term "emir" designates a military commander, governor of a province, or high military official).  Hence, short of the letters "M.K." and "K.S." (which might or might not be the abbreviations of M.K. and/or K.S.'s actual names), the Court has no certainty as to either the identities or even actual existence of M.K. or K.S. and can extrapolate from these designations only that, if they both do exist, they are likely to be male since -- had they been females -- they would probably utilize the noun "Æmera."

[2]  Granted that "Allah" means "God" in Arabic and refers to the supreme deity, see Reza Aslan, No god but God: The Origins, Evolution, and Future of Islam (2006), Bey's "name" appears to be a fictitious self-granted title (perhaps implying that Bey sees himself as the "universal supreme god descending from 'Bey'-suffixed Moors").  Since one of the pleadings signed by Bey is a complaint suggesting that those who associate themselves with the Marrakush Society designate their  self-granted titles as "attributes," see Marrakush Society v. Township of Newfield,  09-3591 (D.N.J.), Docket Entry No. 1, at 1 ("I [don't] have a name.  I have an attribute"), the Court will utilize the term "attribute" to designate all such self-granted titles.

M.K., K.S. and Bey executed their instant applications either in their own names or on behalf of the so-called Marrakush Society ("Marrakush Society") and, more often than not, made assertions suggesting that they personally -- and also the Marrakush Society -- have legal representation by an entity designated as the Aboriginal Law Firm ("Aboriginal Law Firm").

## II.   <u>MARRAKUSH SOCIETY AND ABORIGINAL LAW FIRM</u>

Since, as noted <u>supra</u>, the allegations contained in the pleadings and applications signed by M.K., K.S. and Bey are paraphrased as claims raised by the Marrakush Society, and styled to create an impression that the Aboriginal Law Firm represents the Marrakush Society (and/or M.K. and/or K.S. and/or Bey), the Court begins its discussion by assessing the information released by the Marrakush Society and the Aboriginal Law Firm in the public domain.

### A.   MARRAKUSH SOCIETY

It is unclear to this Court, from the face of the numerous pleadings currently before the Court, whether the Marrakush Society is an actual juridical entity.  However, it is certain that Marrakush Society exists online as a "MySpace" social webpage. <u>See</u> <<http://www.myspace. com/marrakushsciencetemple>>.[3]  The heading of the webpage -- a section containing the phrase "Marrakush Society" (garnished with both federal and state trademark symbols) -- offers the visitor the Marrakush Society's logo, which is an a type of pyramid, and invites the visitor to send a message, find a friend and to add a comment.  In addition, this section clarifies that the

---

[3]  All references to the webpages maintained by the Marrakush Society and/or the Aboriginal Law Firm reflect the Court's research as of July 20, 2009.  Each Internet source cited herein is captured and preserved, in PDF or – where applicable – in MS MediaPlayer format, on a compact disk filed with the Clerk of the Court in connection with this Opinion.

Marrakush Society is located in "Marankokush Principality, Timbuctoo Territory,[4] Samal

Shariq,[5] MA," a non-existing geographic designation.  The body of the webpage offers the visitor

four tabs.  Two tabs, titled "Treaty" and "Contact Us," open to nothing but blank pages.  One tab,

titled "MKST" (seemingly, abbreviating the term "Marrakush Society"), contains nothing but a

larger image of the very same Aztec pyramid logo. Finally, the tab titled "Marrakush Empire"

opens to a page containing a paragraph of writing and a picture of an ancient Egyptian symbol of

protection, known as "the Eye of Ra" or "the Eye of Horus." See David P. Silverman, Ancient

Egypt (1994).  The paragraph spells the word "Marrakush" as "Murakush" (i.e., by utilizing the

now-archaic Berber phrase meaning "Land of God," which was used in the Medieval Morocco to

---

[4]  While the words used in this geographic designation mostly have no meaning, the word "Timbuctoo" is an actual geographic destination.  However, it has no relation to the State of Massachusetts; rather, it is a community in Yuba County, California.  See  <<http://geonames. usgs.gov/pls/gnispublic/f?p=gnispq:3:3315513088967843::NO::P3_FID:1660003>>.  The Court cannot rule out the possibility that the authors of the webpage were hoping to make a reference to "Timbuktu," a city in Tombouctou Region in the West African nation of Mali, which is the site of Sankore Mosque, see <<http://www.pbs.org/wonders/Episodes/Epi5/5_wondr6.htm>>, an Islamic pyramidal structure vaguely resembling, in its shape, the image utilized by the Marrakush Society as its logo.

[5]  While the word "shariq" means "partner" in Arabic and is transcribed as " شزبك ", the word "samal" is archaic (it meant "the remainder of water in the tank," see John A Haywood, Arabic Lexicography 103 (1965), and has become a profanity in the Moroccan lingo).  However, in one of the actions initiated by the Aboriginal Law Firm, the motion indicated that -- to the draftor -- the term "samal" meant "north," see Aboriginal Law Firm v. Bock, 09-80067, Docket Entry No. 3, at 1 (DTKH) (S.D. Fla.), although the word "north" is actually pronounced as "šmal" in classic Arabic, and as "šmaal" in the modern literary Arabic.  See Jeffrey G. Heath, Jewish and Muslim Dialects of Moroccan Arabic (2002) (providing English phonetics and explaining that the pronunciation of "š" is /ʃ/, i.e., a sound similar to English "sh").  In light of the references to the Barbary Treaties made in the Marrakush Society and/or M.K.'s submissions to the federal courts, see infra Part III, it appears that the author(s) of the webpage and of the documents submitted in this District and in its sister courts were aiming to refer to the United States of America as the "northern partner" of the ancient Marrakesh, under the Barbary Treaties.

designate the city of Marrakesh) and copying the history of Morocco from two sources: (a)

Wikipedia, see <<http://en.wikipedia.org/wiki/Morocco#Alaouite _Dynasty_1666.E2.80.

931912>>; and (b) an article by Linda D. Kozaryn, titled "Cohen Renews U.S.-Morocco Ties."

See <<http://www.defenselink.mil/news/newsarticle.aspx?id=41811>>.

In light of the above-described peculiar mix of references to Malian, Egyptian and

Moroccan references, employ of an imaginary geographic designation and quasi-Arabic terms, as

well as reproduction of web articles without designation of the source of the information, it is

unclear to this Court whether the Marrakush Society is actually a bona fide juridical entity (that

is, a corporation, partnership, limited liability company or the like) or simply a materialization of

someone's interest in obtaining an imprimatur of legitimacy through authorship of an Internet

social webpage.

**B.    ABORIGINAL LAW FIRM**

**1.    Main Website**

Research discloses that the Aboriginal Law Firm maintains a website and, in addition,

three webpages, including video clips released in the Internet. The website is located at

<<http://aboriginallawfirm.org/>>.  The front page states the "Aboriginal Law Firm's" name

(which is accompanied by the copyright symbol, as well as by state and federal trademark

symbols) and begins with a logo composed of: (a) Masonic square and compass; (b) Themis'

blind-folded head impaled on the Scales of Justice; and (c) the number "7" locked in a four-

pieced circle, which is the symbol utilized by the Moorish Science Temple of America.[6]

---

[6]

[The Moorish Science Temple of America is a] black Islamic sect . . . .
[T]hree-fourths of its temples (congregations) are inside prisons.  The Moors, as

Compare <<http://aboriginallawfirm.org/>> to <<http://free masonry.org>> and <<http://www.hermetic.com/bey/7koran.html>>.  The website designates the Aboriginal Law Firm's address as "Marankokush Principality,  Timbuctoo Territory, P.O. Box 2015, New Jersey State Republic, 00046," i.e., the same imaginary "principality" and "territory" as the ones utilized in the address asserted by the Marrakush Society, but – this time -- placing both the "principality" and the "territory" not in the State of Massachusetts but in the "New Jersey State Republic."

The front page of the website informs the visitor that the Aboriginal Law Firm "offer[s] a wide variety of legal services to our potential clients and clients alike" and promises 10% discount to its "first-time clients."  See <<http://aboriginallawfirm.org/>>.  In addition, the front page spells out the legal services provided by the Aboriginal Law Firm, listing:

(a)     the tasks that could plausibly be construed as legal work (i.e., "Production of By-Laws," "Entity Dissolutions," "Civil Debt Dissolutions," "Corporate Dissolutions," "Marriage Dissolutions," "Administrative Remedies" and "Power of Attorney");

(b)     the tasks that could be construed as an indication that the Aboriginal Law Firm is willing to complete preprinted forms (e.g., to produce "Nationality Declarations," "Charge Backs," "UCC 1 Filings, "UCC Addendums," "UCC 3 Filings" and "Rights To Travel Affidavits");

(c)     the tasks that cannot be legitimately performed by any attorney, since these tasks fall within exclusive powers of agencies, religious institutions or bar associations (for

---

adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . .   Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).

instance, "Notices to the Bar," "Baptismal Records," "Birth Records" and "Federal Criminal Complaints"); and

(d)     the tasks that make no sense whatsoever, <u>i.e.</u>, "Nationality Proclamations," "Records of Aboriginality," "Federal & State Authentication of Security Instruments," "National Bills of Exchange," "International Bills of Exchange," "Certificates of Nativity" and "Oath & Bond Inquiries."  <u>See</u> <<http://aboriginallawfirm.org/>>.
The front page closes with the Aboriginal Law Firm's mission and business statements;

the latter indicates that the Law Firm "was founded in 2005" by M.K. and K.C. "to assist the

uplifting of fallen humanity."  <u>Id.</u>

The "Partners and Clients" page of the website asserts the Aboriginal Law Firm's

association with numerous imaginary organizations and a handful of actually existing ones

(although the names of the latter are systemically misspelled) and, in addition, provides an

alternative address for the Aboriginal Law Firm, <u>i.e.</u>, "Quinnitukqut Territory, P.O. Box 1145,

Hartford, CT 061430."  <u>See</u> <<http://aboriginallawfirm.org/partners.html>>.

Adding to the concerns caused by the above, the "About Us" webpage of the site asserts

that the Aboriginal Law Firm's "partners and associates have over 50 years of combined

experience in facilitating lawful and legal remedies" and enhances this statement with a copied-

from-the-website-of-<<http://www.orientalist-art.org.uk/barratti6.html>> reproduction of a

painting by an Italian nineteenth century painter, Filippo Barratti, titled "Prisoner" and depicting

a narghile-smoking sultan and his sword-decorated visier who are jointly relishing the view of a

hand-tied, half-naked kneeling elderly Caucasian prisoner with a long bead and what seems to be

a yarmulka.[7]  <u>See</u> <u>id.</u>

_____

        [7]  One of the two remaining webpages of the site, titled "Testimonials," informs the visitor that "[t]his page is under construction," while the other webpage titled "Jurisprudence" provides a definition of natural law and, upon praising this school of jurisprudence, asserts that Muslim scholars preferred natural law and conflates the schools of Western legal thought into a

2.      **MySpace Webpage**

The content of the Aboriginal Law Firm's MySpace webpage suggests that the Aboriginal

Law Firm is nothing but an attempt by some individual(s) to develop social associations and,

perhaps, personal relationships.  Specifically, the webpage: (a) asserts that it belongs to an

"Attorney's In Fact," see <<http://www.myspace.com/aboriginallawfirm>> (the possessive

apostrophe and subjective genitive form in original), seemingly in order to differentiate the

author of the webpage from the attorneys duly admitted to legal practice and known as

"attorneys-at-law"; (b) claims that the author is a 99-year-old male;[8] (c) recites the Aboriginal

Law Firm's "Timbuctoo Territory" address, this time placing the "Territory" in the mysterious

"Samal Shariq"; (d) informs the webpage visitor that the author is "single" and "networking,"

and born under the Zodiac sign of Virgo; (e) maintains that the Aboriginal Law Firm "is a

siblingary [sic.] entity subject to the InterContinental Aboriginal Union";[9] and (f) completes with

single one: positivism.  See <<http://aboriginallawfirm.org/jurisprudence.html>>.

[8]  The seeming tendency to exaggerate the age of the author(s) of the Aboriginal Law
Firm's webpage, see  <<http://www.myspace.com/aboriginallawfirm>> (asserting that the author
is a 99-year old "male"); accord <<http://www.myspace.com/marrakushsciencetemple>>
(asserting that the "rights" to the webpage of the Marrakush Society are "reserved" by a 99-year-
old "female") appears in line with M.K. and K.S.'s references to themselves as "sheikhs," i.e.,
utilization of an honorific common to Arab cultures, used predominantly in order to designate a
revered wise man or an Islamic scholar, but also employed as an appellation to any elder –
regardless of the addressee's intellectual might -- if the addressee is truly of advanced years.  See
<<http://www.britannica.com/EBchecked/topic/539574/sheikh>>; see also Yasir Suleiman,
Nationalism and the Arabic Language: A Historic Overview in Arabic Sociolinguistics: Issues
and Perspectives 3-34 (1995); accord Marrakush Society v. Township of Willingboro,  09-3392
(D.N.J.), Docket Entry No. 1, at 4 (asserting M.K.'s displeasure with a statement made by a
policeman who observed that M.K. was "too young to be a lawyer" and out of law school).

[9]  The website of "InterContinental Aboriginal Union" appears to be permanently "down
for maintenance."  See <<http://intercontinentalaboriginalunion.org>>; see also infra Section
New York Action (discussing M.K.'s filings of the documents indicating that the "Union" is a

a  thread of written and video comments, ranging in their content from neutral statements and parables to calls for coordinated gang violence against the United States government and government officials.  See <<http://www.myspace.com/aboriginallawfirm>>.

### 3.    Twitter Webpage

The Aboriginal Law Firm's webpage on the Twitter network, see <<http://twitter.com/ AboriginalLawFi>>, contains only three postings, all made with a-posting-a-minute frequency, that read: (a) "Suing CBS Broadcasting, Inc. and Ted Scouten"; (b) "Suing the Washington Post Company and Roger Loshe for the Marrakush Society"; and (c) "Suing the City of Hollywood, Inc., Hollywood Police Department, Richard Losenbeck, Marc Tortorici and Manny."  These postings suggest that the authors sees the filing of litigation as a social event.

### 4.    Ning Webpage and YouTube Videos

Finally, the Aboriginal Law Firm also authors a webpage on another social network, known as "Ning." See <<http://aboriginallawfirm.ning.com>>. This page: (a) provides an alleged photograph of M.K., depicting a clean-shaved young African-American man wearing a formal tie and suit, and sunglasses;[10] and (d) enables links to two videos titled "Aboriginal Law Firm Presents 'The Noone Project' [Part I]" and "Aboriginal Law Firm Presents 'The Noone Project' [Part II]."  See id.  The same videos are also available on the "YouTube" website.  See <<http://www.youtube.com/watch?v=9TKColaNmEM>> and <<http://www.youtube.com/

_____

fictitious creation of the producers of the Marrakush Society and the Aboriginal Law Firm).

    [10]  The Court assumes that this is the same M.K. who signed pleadings herein.  The Court also notes that posts discussing the litigations at bar, this Court and the Magistrate Judges assigned to these litigations were added to the AboriginalLaw Firm's Ning webpage on June 22, 2009.  See <<http://aboriginallawfirm.ning.com>>.

watch?v=SpPLXlxbAcQ>>.

The first video is slightly under ten minutes long, while the second lasts a bit over seven minutes.  See id.  Although the content of the videos (partly advertizing the Aboriginal Law Firm and partly stating the speaker's views on the United Nations' declarations, the value of city-state model of government, etc.) is of no relevance to the issues addressed in this Opinion,[11] the presentation style employed by the speaker, a clean-shaved young African-American man (who is introduced as "Brother Shyamm," greatly resembling the image on M.K.'s alleged photo), appears pertinent: wearing a formal button-down collar dress shirt and sitting in front of a laptop, the speaker featured in the videos utilizes plain and clear English to convey his multiple points, without ever resorting to any imaginary terms, Arabic or quasi-Arabic words,  euphemisms, riddles or the like.  See id.  Moreover, discussing a certain United Nations' North-African project, the speaker neither makes references to "Marrakush" history nor utilizes Hijri calendar or a concoction of Earth coordinates and fictitious geographic terms to convey his points about the geography and time frame of the project.[12]

_____

[11]   The two exceptions, perhaps, are: (a) the speaker's statement that the Aboriginal Law Firm's office, where the video clips were produced, is located in "an undisclosed location" within the Wall Street area of Manhattan, New York, see <<http://www.youtube.com/watch?v= SpPLXlxbAcQ>>, since this statement suggests that the speaker (and his associates, one of whom is depicted in the video) might not qualify as "impoverished" within the meaning of the in forma pauperis statute; and (b) the speaker's systemic reference to the United Nations Declaration on the Rights of Indigenous Peoples, the document so very frequently referred to in the legal filings made by the Marrakush Society and M.K.  See infra note 19 (discussing the United Nations Declaration on the Rights of Indigenous Peoples); see also infra Part II (detailing the content of pleadings submitted in the multitude of actions initiated by the Marrakush Society, the Aboriginal Law Firm, M.K. and K.S.).

[12]   "Hijri calendar" is Islamic lunar calendar commonly used by Muslims.  See Ahmad S. Dallal, Hijri Calendar: An entry from Macmillan Reference USA's – Encyclopedia of Islam and the Muslim World (2004). Since the first year in Hijri calendar is the year during which prophet

III.   **FEDERAL LITIGATIONS INITIATED BY PLAINTIFFS**

A.   **THE LIST OF KNOWN LITIGATIONS INITIATED BY PLAINTIFFS**

Thus far, the Court was able to locate the following twenty-seven actions initiated by M.K. and/or K.S. and/or Bey and/or the Marrakush Society and/or Aboriginal Law Firm (collectively, "Plaintiffs"); nineteen actions from the batch are currently before this Court.[13]

1.   Aboriginal Law Firm v. Bock (Florida Action - I"), 09-80067 (DTKH) (S.D. Fla.), initiated on January 20, 2009, and terminated on April 17, 2009.

2.   El v. State of Delaware ("Delaware Action"), 09-00144 (SLR) (D. Del.), initiated on March 5, 2009, and terminated on March 19, 2009;

3.   Marrakush Society v. New Jersey State Police, 09-2518 (JBS) (D.N.J.), initiated on May 22, 2009;

4.   Marrakush Society v. Township of Pennsville, 09-2519 (JBS) (D.N.J.), initiated on May 22, 2009;

5.   Marrakush Society v. Township of Mount Laurel, 09-2520 (JBS) (D.N.J.), initiated on May 22, 2009;

---

Muhammad left the city of Mecca for Medina, the current year (that is, the year 2009 in Gregorian calendar) is -- according to Hijri calendar -- the year 1430. See <<http://www.islamic finder.org/dateConversion.php?mode=ger-hij&day=20&month=7&year=2009&date_result=1>> (providing an online conversion of Gregorian dates to Hijri dates, and vice-versa). Each and every complaint submitted by the Marrakush Society and/or the Aboriginal Law Firm in this and all other federal courts is thickly peppered by references to Hijri dates, although many also bear parallel conventional calendar dates. See infra Part II (detailing the style of submissions made on behalf of the Marrakush Society).

[13]   The Court, however, does not rule out the possibility that M.K. and/or K.S. and/or Bey and/or Marrakush Society and/or the Aboriginal Law Firm initiated other litigations: the list of actions included in the instant Opinion states the results of only a brief search, and other cases could have escaped the Court's attention.

6.      Marrakush Society v. Township of Westampton,  09-2521 (JBS) (D.N.J.), initiated on

May 22, 2009;

7.      Marrakush Society v. Township of Willingboro,  09-2522 (JBS) (D.N.J.), initiated on

May 22, 2009;

8.      Marrakush Society v. City of Hollywood, Inc. ("Florida Action - II "),  09-60828 (ASG)

(S.D. Fla.), initiated on June 3, 2009, and terminated on July 7, 2009;

9.      Marrakush Society v. Broward Sheriff's Office ("Florida Action - III "),  09-60829 (ASG)

(S.D. Fla.), initiated on June 3, 2009, and terminated on July 7, 2009;

10.      Inter-Continental Aboriginal Union Marrakush Society v. CBS Broadcasting, Inc.

("Florida Action - IV "), 09-60830 (ASG) (S.D. Fla.),  initiated on June 3, 2009, and

terminated on July 7, 2009;

11.      Inter-Continental Aboriginal Union Marrakush Society v. The Washington Post

Company,  ("Florida Action - V "), 09-60831 (UU) (S.D. Fla.),  initiated on June 3, 2009,

and terminated on June 4, 2009;

12.      Marrakush Society v. Township of Westampton,  09-3441 (JBS) (D.N.J.), initiated on

July 5, 2009;

13.      Marrakush Society v. City of Dania Beach, Inc. ("Florida Action - VI "), 09-60866

(WPD) (S.D. Fla.), initiated on June 9, 2009, and terminated on June 15, 2009;

14.      In re El ("New York Action "), 09-406 (unassigned) (E.D.N.Y), initiated on June 26,

2009, and terminated on July 1, 2009;

15.      Marrakush Society v. Township of Westampton,  09-3442 (JBS) (D.N.J.), initiated on

June 5, 2009;

16.     El. v. Cox, 09-3371 (JBS) (D.N.J.), initiated on July 6, 2009;

17.     El. v. Cox, 09-3372 (JBS) (D.N.J.), initiated on July 10, 2009; and

18.     Marrakush Society v. Township of Willingboro,  09-3392 (JBS) (D.N.J.), initiated on

        July 10, 2009.

19.     Marrakush Society v. Township of Pennsville,  09-3502 (JBS) (D.N.J.), initiated on June

        5, 2009.

20.     Marrakush Society v. Township of Willingboro,  09-3503 (JBS) (D.N.J.), initiated on

        June 5, 2009.

21.     Marrakush Society v. Burlington County Jail,  09-3504 (JBS) (D.N.J.), initiated on June

        5, 2009.

22.     Marrakush Society v. Township of Mansfield,  09-3505 (JBS) (D.N.J.), initiated on June

        5, 2009.

23.     Marrakush Society v. Superior Court of New Jersey,  09-3506 (JBS) (D.N.J.), initiated on

        June 5, 2009.

24.     Marrakush Society v. Township of Mount Laurel,  09-3507 (JBS) (D.N.J.), initiated on

        June 5, 2009.

25.     Marrakush Society v. Township of Vineland,  09-3589 (JBS) (D.N.J.), initiated on July

        20, 2009.

26.     Marrakush Society v. Township of New Jersey State Police, 09-3590 (JBS) (D.N.J.),

        initiated on July 20 2009.

27.     Marrakush Society v. Township of Newfield,  09-3591 (JBS) (D.N.J.), initiated on July

20, 2009.

In sum, it appears that M.K. and/or K.S. and/or Bey and/or the Marrakush Society and/or the Aboriginal Law Firm have been initiating roughly an action a week over the past half a year (with the last twenty actions being initiated within forty-eight days) and selected this District as their most frequent forum, while filing other cases in the federal courts for the Southern District of Florida, Eastern District on New York and the District of Delaware.

**B.    SUBSTANTIVE AND PROCEDURAL ASPECTS OF PLAINTIFFS' ACTIONS**[14]

**1.    Cases Filed in Other Districts**

Since the content and style of the pleadings submitted in – and the treatment of  – Plaintiffs' cases in other district courts appears relevant to the concerns at hand, the Court begins its discussion with an overview of the Plaintiffs' litigation in the Florida, New York and Delaware federal courts.

---

[14]  The Court takes judicial notice of the filings made by the Plaintiffs in this and other courts.

> Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002).  Notably, "[a] court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings."  Inductotherm Indus. v. United States, 2002 U.S. Dist. LEXIS 14046, at *6-7 (D.N.J. Mar. 27, 2002); see also Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings'") (quoting Harris v. New York State Dep't of Health, 202 F. Supp.2d 143, 173 (S.D.N.Y. 2002), and citing Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)).

a.      **Florida Actions**

i.      *Florida Action - I*

Commenced on January 20, 2009, <u>Florida Action - I</u> appears to be the Plaintiffs' "pilot

project."  <u>See</u> <u>Aboriginal Law Firm v. Bock</u>, 09-80067 (S.D. Fla.).  In that action, the Clerk for

the Southern District of Florida received a package consisting of: (a) a civil complaint; (b) an

application to proceed <u>in</u> <u>forma</u> <u>pauperis</u>; and (c) a motion for "emergency relief."  <u>See</u> <u>id.</u>   The

complaint had eleven pages, each topped with the letterhead of Aboriginal Law Firm.[15]  <u>See</u> <u>id.</u>,

Docket Entry No. 1.  Although reduced to comprehensible English, the complaint contained,

mostly, abstract irrelevant statements and proclamations, some bolded out and some italicized, or

both.  <u>See</u> <u>id.</u>  The only pertinent fact asserted was the statement that unspecified residents of a

certain real estate were evicted, but this fact was not developed into a coherent allegation.  <u>See</u>

<u>id.</u> at 6, 9.  The relief sought was  an order directing either the State of Florida or an unspecified

municipality to: (a) record unspecified documents; (b) grant the Aboriginal Law Firm the right of

access to an unspecified locale; and (c) grant costs associated with enforcement of this "right."

<u>See</u> <u>id.</u> at 6-10.

The accompanying application to proceed <u>in</u> <u>forma</u> <u>pauperis</u> was executed by someone

who referred to himself as "Authorized Representative Jabril A. Muhammadan El-Bey."[16]  <u>See</u>

---

[15]  In that letterhead, the address of the Aboriginal Law Firm was different from those
discussed above: it was designated as "Teketa Territory, Suite 14, 1129 Royal Palm Beach Blvd.
Royal Palm Beach, Fl 33411."  <u>See</u> <u>Florida Action - I</u>, Docket Entry No. 1.  It appears that the
term "Teketa" was borrowed by the author(s) from the name of the Teketa American-Indian
tribe that populated southeastern Florida.  <u>See</u> <<http://www.hartford-hwp.com/Teketa/>>.

[16]  A person identified by the same name is also a frequent contributor to the Aboriginal
Law Firm's Ning social webpage.  <u>See</u> <<http://aboriginallawfirm.ning.com/>>.

id., Docket Entry No. 2.  The attached "Emergency Motion of Relief from Judgment" requested a "Writ of Possession" and designated the locale at issue in terms of Earth coordinates, plus the phrase "Hawab Shariq Abeka-Region of Samal Amaruka Æmexum."  Id., Docket Entry No. 3, at 1.  Largely corresponding to the complaint in terms of irrelevancy of its proclamation-like allegations, the motion seemingly asserted that the plaintiff was likely to succeed on the merits of its/his claim under the United Nations Declaration on the Rights of Indigenous Peoples.[17]  See id. at 2.  Moreover, the motion did not clarify which judgment the relief was sought from, or the basis for federal jurisdiction over the tribunal which issued that unidentified judgement.  See generally id., Docket Entry No. 3.

Judge Hurley, presiding over the Florida Action - I, denied the motion stating that "the court is unable to determine from the emergency motion exactly what relief plaintiff is seeking from [certain defendants]; what it is that [these defendants and other defendants] are alleged to have done; why plaintiff is entitled to any relief; or even what the case is generally about. The complaint makes only vague and confusing allegations [which] are simply too obscure to justify any emergency ex parte relief . . . ."  Id., Docket Entry No. 4, at 1.  Then, on April 17, 2009, Judge Hurley denied the Aboriginal Law Firm in forma pauperis status and dismissed the complaint.  See id. Docket Entry No. 5.

---

[17]  Being a declaration, rather than a treaty, the United Nations Declaration on the Rights of Indigenous Peoples is not a binding instrument even for the purposes of the countries that voted in favor of its adoption.  A fortiori, the Declaration is not binding on the countries that voted against adoption of the instrument, that is, on Australia, Canada, New Zealand, and the United States.  See John R. Crook, United States Votes Against Adoption of UN Declaration on Indigenous Peoples, 101 A.J. Int'l. L. 884 (2007).

ii.     *Florida Action - II*

The next Plaintiffs' action in the Southern District of Florida was initiated a month and a half after Judge Hurley dismissed <u>Florida Action - I</u>.  <u>See</u> <u>Marrakush Society v. City of Hollywood, Inc.</u>, 09-60828 (S.D. Fla.).  Accompanied by five "civil action warrants,"[18] the complaint in <u>Florida Action - II</u> contained only two paragraphs vaguely asserting eviction of unidentified individuals from a certain real estate (designated as "the Aboriginal and Indigenous Land / Royal Property approximately Earth coordinates of 25° 00'56.05" N, 80° 07'55.78 W" at a Sea Level of 0 Meters, within the Timucua Principality of the Tekesta Territory of the Hawab Shariq Region, Samal Marika"),[19] expressing the litigant's disappointment with a statement made by the local television channel and utilizing reference to Hijri months.  <u>See</u> <u>id.</u>, Docket Entry No. 1.  The complaint: (a) concluded with the statement, "I am aware of the facts because I am an

_____

[18]  These homemade "civil action warrants" -- each of which was executed by the Aboriginal Law Firm and decorated with the symbol of the Moorish Science Temple of America -- asserted a new address of the Marrakush Society, namely, "Marrakush Science Temple, Jurisprudence Chambers, Timicua Principality, Tekesta Territory, P.O. Box 607, State of Florida Republic 33302," and had nothing in common with usual civil warrants, <u>i.e.</u>, instruments used to enforce a judgment or an order of the court.  Rather, these "civil action warrants" presented an anomalous mix of an arrest warrant and a judgment: (a) being directed "Attn. [of] United States District Court for the Southern District of Florida; United States Attorney's Office District of Florida; U.S. Attorney's Office [presumably, different from the prior one]; Office of Attorney General [presumably, yet another one]; Federal Bureau of Investigation [and] President of the United States of America Barack Obama"; and (b) closing with an "injured party allograph," as well as with an "oath" directing arrest of "the named defendant" and "defendant['s] issu[ance of] a certified bond in the penal sum of $20,000,000 lawful United States money payable as relief and remedy to the injured party."  <u>Florida Action - II</u>, Docket Entry No. 1, at 3-7.

[19]  The Court presumes that the author(s) of the complaint named this newly-created "principality" after a group of American-Indian tribes that populated northern and central parts of Florida and spoke Tumucua language, <u>see</u> Julian Granberry, <u>A Grammatical Sketch of Timucua</u>, Int'l J. Am. Linguistics (1990), and -- seemingly to "enhance" this odd geographic designation -- added in the word "Hawab" perhaps borrowed from the story of "Dogs of Al-Hawab" known to some Islamic theologians.  <u>See</u> Shaykh Fadhlalla Haeri, <u>The Thoughtful Guide to Sufism</u> (2004).

injured party in this matter"; (b) indicated that it was executed on the "2th [sic.] Day of Jumada II"; and (c) bore the signature of someone identified as "Noble Æmer A.M. El."  See id. at 2. The attached in forma pauperis application was entirely blank, short of the entry of the "Marrakush Society" as the plaintiff, the "City of Holliwood, Inc. et al" as defendants and  the signature of "Noble Æmer Jabril A.M. El."[20]

Addressing the content of the complaint and the Marrakush Society's application to proceed in forma pauperis, Judge Gold dismissed the complaint and denied in forma pauperis status, explaining that

> Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief.  The [c]omplaint[] contain[s] no claim as to how Plaintiff is entitled to relief, and cannot be construed as a plain statement of claim. . . . Further, Plaintiff's [c]omplaint[] fail[s] to set forth an adequate basis for subject matter jurisdiction. . . . Finally, it appears that Plaintiff is attempting to proceed without counsel in this matter.  As an artificial entity, . . . Plaintiff must be represented by counsel.  Similarly, as an artificial entity, Plaintiff is ineligible to proceed in forma pauperis.

Id., Docket Entry No. 4, at 2-3 (citations omitted).[21]

### iii.    *Florida Action - III*

Commenced on the same day as Florida Action - II, its companion matter Florida Action - III differed little in the content of its submissions.  See Marrakush Society v. Broward Sheriff's Office,  09-60829 (ASG) (S.D. Fla.).  The key difference was limited to the assertion that a

---

[20]  It appears that "Noble Æmer Jabril A.M. El" is the same person who signed the documents in Florida Action - I and the frequent participant of the Aboriginal Law Firm's Ning webpage.  See <<http://aboriginallawfirm.ning.com/>>.

[21]  Although Judge Gold dismissed the Florida Action - II without prejudice, no filing fee submission and no submissions of an amended complaint -- or any other document -- was made in that matter.  See generally, Florida Action - II, Docket Sheet.

certain eviction took place at a different day of the month of Jumada I, and involved the locale

designated by different Earth coordinates within the same "Aboriginal and Indigenous Land /

Royal Property . . . within the Timucua Principality of the Tekesta Territory of the Hawab Shariq

Region, Samal Marika." Id., Docket Entry No. 1, at 6.  The remainder of the submission was

largely the same, i.e., the complaint arrived accompanied by three homemade "civil action

warrants," contained only a paragraph of vague statements, concluded with "I am aware of the

facts because I am an injured party in this matter," bore the signature of the same "Noble Æmer

A.M. El" and had, as an attachment, an entirely blank in forma pauperis application signed by the

person asserting the same attributes.

However, the application also included a new type of a document, somewhat resembling

a cover letter.  Addressed to the clerk of the court of the court for the Southern District of

Florida, and marked also, "Cc: Honorable Federico A. Moreno, Chief Judge," this "cover letter"

read, in its entirety, as follows:

> The Marrakush Society is an Ecclesiastical Imperial Civil Jural Society and
> Aboriginal Entity on file with the Gloucester County Clerk of New Jersey, Docket
> Entry No: 50480, MS 14 230, Cumberland County Clerk of New Jersey,
> Instrument No: 341828 Bk: 4057, Pg: 6579, Secretary of the District of Columbia
> Apostille No: 201512 and Broward County Record Division of Florida,
> Instrument No: 108385178 Bk: 459050, Pg: 842, Secretary of State, State of
> Florida Apostille No: 2009-466.  Pursuant to the Barbary Treaties with Murakush
> Empire, the United Nations Declaration on the Rights of Indigenous Peoples,
> IACHR Inter-American Draft on the Right of Indigenous Peoples, and Florida
> State Statute Title XXXVI, Chapter 622.  Crandall v. Nevada, 73 U.S. 35 (1867)
> provides that all Sovereign and Private Civilians shall have free access to all
> judicial proceedings.  Always in Honor! Noble Æmer A.M. El.

Id., Docket Entry No. 2, at 3.

Although it appears that the "cover letter" was executed with the goal to instill in the reader a sense of legitimacy of the Marrakush Society, the content of the "cover letter" prompts a conclusion to the contrary, since:

(a)     the references to "Docket Entry No: 50480, MS 14 230," "Instrument No: 341828 Bk: 4057, Pg: 6579" and " Instrument No: 108385178 Bk: 459050, Pg: 842" merely indicate that certain individual(s) brought to the clerk's offices in Gloucester, Cumberland and Broward Counties certain documents for recording in "miscellaneous" books, i.e., in the books that allow recordation of *any* document, regardless of the document's content, see <<http://www.co.gloucester.nj.us/Government/Departments/Clerk/Clerkhome.cfm>>; <<http://www.co.cumberland.nj.us/content/173/2133/3337/3363.aspx>>; <<http://www.clerk-17th-flcourts.org/ClerkWebsite/welcome2.aspx>>;

(b)     the references to apostilles merely indicate that some unspecified documents were presented by certain individual(s) to a state official for affixation of apostille;[22]

(c)     the references to the Barbary Treaties, Declaration and the "draft" could not be of any relevance to the Plaintiffs' litigation, since: (i) the Barbary Treaties (negotiated in the eighteenth and nineteenth century by the United States and four African city-states) have long expired or been superceded, see Frank Lambert, The Barbary Wars: American Independence in the Atlantic World (2007); and (ii) the Declaration on the Rights of Indigenous Peoples is not a law or even a binding document in the United States,

---

[22]  Apostille -- which is merely a standard form of certification of "a" document issued in one nation -- is utilized, pursuant to the Hague Conference of 1961 on Abolishing the Requirement of Legislation for Foreign Public Documents, in order to have this document authenticated for a use in other nations.  See Black' Law Dictionary 96 (6th ed. 1990).

see supra note 19, same as the "IACHR Inter-American Draft on the Right of Indigenous

Peoples";[23] and, finally,

(d)    neither the language of Florida § 620.8202 nor the holding of Crandall, 73 U.S. 35,

provided the Plaintiffs with any support, since: (i) to be recognized as a "foreign

unincorporated association" under Section 620.8202, the Marrakush Society had to be a

joint stock association formed in one of the states of the United States, other than Florida,

see  Asociacion de Perjudicados por Inversiones Efectuadas en U.S.A. v. Citibank,

F.S.B., 770 So. 2d 1267, 1268 n.1 (Fla. Ct. App. 2000); and (ii) the Supreme Court in

Crandall addressed the issue wholly unrelated to either the legitimacy of the Marrakush

Society or even to the asserted access to court; rather, the case deals with the issue of

interstate travel.  See Cook v. Pennsylvania, 97 U.S. 566, 571 (1878) (summarizing the

claims and holding on In re Crandall); Maldonado v. Houstoun, 157 F.3d 179, 185 (3d

Cir. 1998) see also (same).

In sum, it appears that the "cover letter" presented nothing but a motley of meaningless

language, heavily laced with quasi-legalese.  Hence, Judge Gold, presiding over Florida Action -

III action, dismissed the complaint after explaining to the Marrakush Society, once again, that the

submission did not comply with the "short and plain statement" requirement posed by Rule 8(a),

that the Marrakush Society could not  proceed in forma pauperis and that it had to be represented

by counsel.  See Florida Action - III, Docket Entry No. 3.  Although Judge Gold dismissed the

complaint without prejudice, no further filings were made in Florida Action - III.

---

[23]  The Court presumes that the abbreviation "IACHR"was intended to designate the
Inter-American Commission on Human Rights, since the "cover letter" made reference to its
draft of 1995.  See <<http://www.ankn.uaf.edu/IKS/iachr.html>> (replicating the draft).

**iv.**     *Florida Action - IV*

Florida Action - IV was commenced on the same day as Florida Action - II and III,
although -- this time -- the Marrakush Society also affixed to its name, as the plaintiff in that
matter, the name of its creation, the "Inter-Continental Aboriginal Union," hence yielding
Inter-Continental Aboriginal Union Marrakush Society v. CBS Broadcasting, Inc., 09-60830
(S.D. Fla.).

In all other respects, however, the submitted package presented largely a repetition of the
familiar same, i.e., it contained references to Hijri calendar and to  "the Aboriginal and
Indigenous Land / Royal Property . . . within the Timucua Principality of the Tekesta Territory of
the Hawab Shariq Region, Samal Marika," plus a set of the same homemade "civil action
warrants,"  "cover letter," a statement "I am aware of the facts because I am an injured party in
this matter," the signature of "Noble Æmer A.M. El" and his entirely blank in forma pauperis
application.

This action was consolidated by Judge Gold with his Florida Action - II and Florida
Action - III matters and terminated accordingly, being dismissed without prejudice to submission
of an amended complaint complying with Rule 8, together with $350 filing fee and a notice of
appearance of a duly admitted counsel.  See Florida Action - IV, Docket Entry No. 5.  However -
- same as in Florida Action - II and III -- the Plaintiffs did not take advantage of the leave granted
them by Judge Gold and made no post-dismissal submissions.

**v.**     *Florida Action - V*

As with Florida Action - II, III and IV, Florida Action - V was commenced on June 3, 2009, and -- just like in Florida Action - IV, had the plaintiff's name composed out of the Marrakush Society and its creation, the "Inter-Continental Aboriginal Union."  See Inter-Continental Aboriginal Union Marrakush Society v. The Washington Post Company, 09-60831 (UU) (S.D. Fla.).  Being effectively duplicative of Florida Action - IV, Florida Action - V presented the Southern District of Florida with the same set of submissions, i.e., references to Hijri calendar and to "the Aboriginal and Indigenous Land / Royal Property . . . within the Timucua Principality of the Tekesta Territory of the Hawab Shariq Region, Samal Marika," a homemade "cover letter"and a set of homemade "civil action warrants" (although, this time, the package also included a "civil action-trade dress infringement-complaint-warrant"[24]), a statement "I am aware of the facts because I am an injured party in this matter," the signature of "Noble Æmer A.M. El" and his blank in forma pauperis application.

The distinction, if any, between Florida Action - V and Florida Action - IV actions was only in the length of the complaint, which informed the reader that the full attribute of "Noble Æmer A.M. El" was "the Aboriginal Indigenous Grand Sheik, Ambassador, and Consular of the Marrakush Science Temple, of the Timucua Principality of the Tekesta Territory, Noble Æmer A.M. El."  See Florida Action - V, Docket Entry No. 1, at 2.  In addition, upon so informing, the complaint -- taking four pages for the discussion -- expressed the Marrakush Society's opinion

---

[24]  Unlike the "civil action warrants," this homemade "civil action-trade dress infringement-complaint-warrants" did not seek $20 million bond payment from each defendant and merely requested the defendants' arrest under the notary seal of the Mercer County clerk.  See Florida Action - V, Docket Entry No. 1, at 7.

that a depiction of its logo in a television report constituted "trademark infringement" and detailed the author's displeasure with the television reporter's reference to the Marrakush Society as a "part of a little known Islamic faction" and "squatters [who took] over [a] vacant home." Id. at 1-4.

Addressing this submission, Judge Ursula Ungaro explained to the Plaintiffs that the Marrakush Society could not proceed in forma pauperis and, upon also finding that the allegations did not state a cognizable claim, dismissed Florida Action - V. See id., Docket Entry No. 4.

**vi.** *Florida Action - VI*

It appears that Florida Action - VI was the latest filing made by the Plaintiffs in the Southern District of Florida, see Marrakush Society v. City of Dania Beach, Inc., 09-60866 (S.D. Fla.). The most voluminous among the Plaintiffs' actions commenced in the Southern District of Florida, Florida Action - VI was initiated on June 9, 2009. See id., Docket Entry No. 1. In this latest action, two complaints were submitted. A two-page document (laced with lengthy attributes and designations of geographic locales identical, in their style, to those used in Florida Action - II, III, IV and V) the first complaint asserted that "Noble Æmer A.M. El" and his family and/or acquaintances were evicted from a certain real estate, which they held under the guise of adverse possession. See id., Docket Entry No. 1. This first complaint arrived together with a "Notice of Filing Exhibits," a document paraphrasing the Marrakush Society's usual "cover

letter" in terms of Hijri dates, see id., Docket Entry No. 1-2, at 1, plus with twelve pages of mostly unreadable documents.[25]

The second complaint, a seven-page document of equally dense language, re-described the events already asserted in the first complaint and, in addition, indicated that "Noble Æmer A.M. El" was arrested upon resisting eviction.  See id. Docket Entry No. 2.   Attached to the second complaint there was a blank in forma pauperis application by Marrakush Society signed by "Noble Æmer Jabril A.M. El."  See id., Docket Entry No. 3.   In addition, same as in Florida Action - III, IV and V, the second complaint arrived accompanied by the familiar "cover letter." See id. Docket Entry No. 3, at 3.  However, instead of "civil action warrants," the package included a set of twelve "criminal complaint warrants," the documents substantively similar to the "civil action warrants," that is, short of the heading.[26]

Judge William P. Dimitrouleas, presiding over the Florida Action - VI matter, dismissed the allegations for failure to state a claim, see id., Docket Entry No. 5, at 3-4, and re-explained to

---

[25]  The few readable pages replicated: (a) an apostille certifying an unspecified document; and (b) a homemade "Record Certification by Document Custodian" generated, apparently, by the Aboriginal Law Firm.  See Florida Action - VI, Docket Entry No. 1-2, at 3-5.

[26]  Same as the "civil action warrants," these "criminal complaint warrants" were decorated with the Moorish Science Temple of America symbol, stated the Marrakush Society address in "Marrakush Science Temple, Jurisprudence Chambers, Timicua Principality, Tekesta Territory, P.O. Box 607, State of Florida Republic 33302," were addressed, "Attn. [of] United States District Court for the Southern District of Florida, United States Attorney's Office District of Florida, U.S. Attorney's Office [presumably, different from the prior one], Office of Attorney General [presumably, yet another one], Federal Bureau of Investigation [and] President of the United States of America Barack Obama," demanded defendant's arrest and closed with an "injured party allograph." The sole difference between these two types of "warrants" was that the "criminal complaint warrants" did not seek "defendant['s] issu[ance of] a certified bond in the penal sum of $20,000,000." Florida Action - VI, Docket Entry No. 4.  In other words, these "criminal complaint warrants" were effectively identical to the so-called "civil action-trade dress infringement-complaint-warrants."

the Plaintiffs the pleading requirements posed by Rule 8.  See id. at 4.       In addition -- same as

Judges Gold and Ungaro -- Judge Dimitrouleas clarified to the Plaintiffs that the Marrakush

Society could not proceed without due legal representation or as an in forma pauperis litigant, see

id. at 5-6, and explained that the Plaintiffs' blank in forma pauperis application could not qualify

even the "Noble Æmer Jabril A.M. El," a seemingly natural person, to the in forma pauperis

status.  See id. at 6.  With that, Judge Dimitrouleas dismissed both complaints, without prejudice

to bringing a properly represented action accompanied by a due filing fee or an actual in forma

pauperis application and stating cognizable claims.  See id.  However, same as in Florida Action

-II, III, IV and V, no further filings were made in the Florida Action - VI matter.  See generally,

id., Docket.

### b.      Delaware Action

In Delaware Action, the application named, as the plaintiffs, the following parties: (a)

Sheik Shaman Raz Amun Ra El; (b) the Marrakush Society; (c) the Marrakush Science Temple;

(d) the Moorish Holy Temple of Science; and (e) the Aboriginal Law Firm.  See El v. State of

Delaware, 09-00144 (D. Del.).  The action, commenced on March 5, 2009 (that is, between the

Plaintiffs' submission of their Florida Action - I and Florida Action - II), asserted challenges

associated  with what appears to be criminal proceedings of "Sheik Shaman Raz Amun Ra El"[27]

in the Delaware Superior Court.  See id., Docket Entry No. 2.

The application, heavily injected with the usual Marrakush Society's mix of obscure

language, Latin legalese and distorted references to long superceded provisions, see, e.g., id. at 2,

_____

[27]  The complaint in Delaware Action indicates that the actual name of "Sheik Shaman
Raz Amun Ra El" was Ronald A. McIntyre.  See Delaware Action, Docket Entry No. 2, at 2.

sought removal of "Sheik Shaman Raz Amun Ra El's" criminal prosecution to the District of

Delaware.  See id. at 4.  The application was signed by "Sheik Shaman Raz Amun Ra El" and

"High Priestess Æmpress T.M. El Bey," arrived accompanied by a set of "criminal warrants"

(identical to those submitted in Florida Action - VI) and by an attachment listing

"representatives" of all entities named as the plaintiffs.[28]  See id. at 5.  Finding the application not

in compliance with the requirements of 28 U.S.C. § 1446, Judge Sue L. Robinson denied

removal and remanded the action to the state court.  See id., Docket Entry No. 5.

### c.    New York Action

The action commenced by M.K. in the Eastern District of New York appears to be,

simultaneously, the most puzzling and the most instructive Plaintiffs' action detected by this

Court.  See In re El, 09-406 (E.D.N.Y.)  Initiated shortly after termination of the Florida Action -

V and Florida Action - VI, the New York Action remained unassigned until its termination.  Five

sets of submissions (among the total of nine filings made in that matter) were, apparently, of such

poor quality that the clerk's office of the Eastern District of New York was unable to scan them

into the docket.  See id., Docket Entries Nos. 4-6, 8 and 9.

However, the information provided in both the docketed and non-docketable submissions

suggests that M.K. commenced that matter in hope to obtain a certain aura of legitimacy for his --

and, seemingly, the Marrakush Society and/or the Aboriginal Law Firm's -- operations through

---

[28]  In that list, M.K. was designated as a mere "Consul" of the Aboriginal Law Firm,
while K.S. was referred to as the "Divine Minister Noble Æmer" of the Marrakush Society
Temple.  See Delaware Action, Docket Entry No. 2. , at 5.

the very fact of the filings made with the Eastern District of New York.[29]  Specifically, the docket in New York Action reflects:

(i)     three non-docketable entries, which have the "docket text" reading "notice of documentation," see id., Docket Entries No. 4-6;

(ii)    two non-docketable entries indicating that M.K. filed a New Jersey-issued apostille of his son's birth certificate and a Maryland-issued apostille with regard to some "Promulgation Proclamation of Record of Formation Certification,"see id., Docket Entries Nos. 8-9;

(iii)   two docketed entries reflecting M.K.'s preference for being referred to not by the attribute "Æmer Shyaam M.K. El" but rather as "Justice Ali-El" or as "Justice Au El," see id., Docket Entries No. 2 and 7, plus M.K.'s preference for having his address "215-50 Jamaica Avenue, #7, [Queens,} New York 11428" changed to the imaginary "Marankokush Principality, Timbuctoo Territorial Estate, United States Republic, Post Box Office 2015, New Jersey State Republic 00046," i.e., to the "address" utilized by the Aboriginal Law Firm.  Compare id., Docket Entry No. 7 to <<http://aboriginallawfirm.org/>>; and

(iv)    the fact that, instead of actual pleadings, M.K. merely submitted a massive compilation of homemade "apostilles" generated by the Aboriginal Law Firm, allegedly pursuant to "the laws of nature."  These homemade "apostilles" were attached to three homemade birth certificates (composed of a juxtaposition of Egyptian symbols and hieroglyphs over Latin lettering), numerous homemade documents titled "promulgation proclamation" (these

---

[29]  See infra note 30 (indicating that M.K. used the fact of his submissions made in the Eastern District of New York to create an impression in this District that his and the Marrakush Society's "credentials" were "on file" with the Eastern District of New York).

documents verify, inter alia, that the "Inter-Continental Aboriginal Union" is a creation of

the Marrakush Society and the Aboriginal Law Firm), a homemade "copy certification by

record custodian" (also generated by the Aboriginal Law Firm) and a number of

homemade records of "Intercontinental Aboriginal Union Uniform Commercial

Recording Bureau," as well as pages and pages of a peculiar "Notice of U.S.

Person/Entity/Item Dissolution" composed of a virtually incomprehensible chain of

quasi-legalese.  See id., Docket Entry No. 1.

While imitating -- or, at the very least, striving to imitate -- official documents, none of

these submissions stated a single claim.  See id..  In fact, they did not contain even a vaguest hint

as to an actual intent to initiate a legal suit.  Rather, accompanied by the filing fee of $39, these

documents suggest nothing but M.K.'s mere interest in having them "placed on file" with a

federal court.  Therefore, it is hardly surprising that the Eastern District of New  York terminated

this matter shortly after commencement, without ever assigning it to any judge.  See generally,

id., Docket.

### 2.    Plaintiffs' Matters Initiated in this District

At the instant juncture, there are nineteen actions pending before this Court that were

commenced by M.K., K.S. and Bey, either personally or on behalf of the Marrakush Society,

with the Aboriginal Law Firm being designated as counsel.   The pleadings in two actions are

styled as habeas applications, while the remaining seventeen seem to aim at setting forth civil

rights challenges, often over and over again.

a.      **Actions Styled as Habeas Applications**

i.      *Civil Action No. 09-3372*

The pleadings in Civil Action No. 09-3372 open with a caption informing the Court that the Aboriginal Law Firm (having address in "Marankokush Principality,  Timbuctoo Territory, P.O. Box 2015, New Jersey State Republic, 00046") represents in this matter M.K., having -- this time -- attributes "Minister Plenipotentiary High Priest Noble Æmer Shyaam M.K. El" of "indigenous ethnicity," and that the so-attributed M.K. is seeking a "writ of habeas corpus [on the grounds of] unconstitutional condition of confinement in the Burlington County Detention Center." See El. v. Cox, 09-3372 ("Habeas - I"), Docket Entry No. 1, at 1 (D.N.J.).

Upon such introduction, the pleadings elaborate that M.K. is seeking "the great writ of habeas corpus ad subjiciendum," cite the Suspension Clause and, once again, misstate the holding of In re Crandall, 73 U.S. 35, in the fashion virtually identical to that utilized in all Marrakush Society's "cover letters" submitted in Florida.  See id.

The next page states that M.K. is currently an "Inmate # 94058," and then  "commands" the respondent to produce to the Court certain unidentified information.  See id. at 1-2.  Upon so commanding, the pleadings proceed with thirty-two paragraphs, each beginning with the word "fact," followed by a colon sign and a statement either stating M.K.'s alleged biographic information[30] or expressing M.K.'s views as to the ethnic status of American and non-American

---

[30]  The biographic data asserts that M.K.: (a) has his "nationality documentation on file in the United States District Court for the Eastern District of New York"; and (b) never applied for a United States work permit, driver's licence, non-immigrant visa, legal alien's "green card" or citizenship on the grounds of citizen parentage, etc.  See Habeas - I, Docket Entry No. 1, at 2-3. In sum, this biographic information creates an impression that M.K. overstayed in the United States illegally after having his visitor's visa expired, even though the statements made in the civil rights cases pending before this Court suggest that M.K. was born in the United States.

persons of color.[31]   The list of these "facts" concludes with an incomprehensible statement that M.K. "is not in custody in violation of the Constitution or laws . . . of the United States [because he is] in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof." Id. at 4.

The remaining four pages of the pleadings are dedicated to an additional discussion of M.K.'s classification of ethnicities within the black race, obscure references to the Universal Declaration of Human Rights, United States Constitution and Supreme Court Justices, as well as numerous generalities followed by citations to the Supreme Court cases.  See id. at 4-7.

These pleadings are accompanied by: (a) a nine-page copy of the United Nations Declaration on the Rights of Indigenous Peoples (i.e., the systemically-cited-in-all-Marrakush-Society's-papers non-binding document); and (b) a four-page copy of the Barbary Treaties of 1786-1816 copied from the website of Yale Law School, plus three pages of "notes" to these treaties and a page of "translations of additional articles" of the same.  See id., Docket Entries Nos. 1-2 to 1-5.  Omitted from this elaborate package are M.K.'s filing fee (or his in forma pauperis application) and a single sentence that might be construed by this Court as an indication of why M.K. -- who seems to be a pre-trial detainee -- might be challenging his detention under

---

[31]   These allegations include M.K.'s opinions that M.K.'s origin "do[es] not lie with any Black Racial Groups from Africa [because his] origin lie[s] with the Original Peoples of this planet [who are of] Aboriginal and Indigenous peoples of Murakush Descent [and, thus, M.K. is] Moorish [rather than] a member of the Black Race," etc. See Habeas - I, Docket Entry No. 1, at 3-4 (elaborating extensively, although in rather murky terms, on M.K.'s position that he should not be considered a black or an African-American, and -- hence -- should be treated like a foreign diplomat and exempt from the jurisdiction of the State of New Jersey).

the United States Constitution or other federal law.  See generally, id., Docket Entries Nos. 1 to

1-5.

ii.    *Civil Action No. 09-3371*

The habeas-styled part of the pleadings submitted in El. v. Cox, 09-3371 ("Habeas - II")

(D.N.J.), virtually mimics the pleadings submitted in the Habeas- I, except that: (a) the caption of

the document asserts that it is an application for a "writ of habeas corpus emergency! petition

unconstitutional conditions of confinement," see id., Docket Entry No. 1, at 1 (punctuation mark

in original); and (b) the body of the document omits the thirty-two "facts" stated in M.K.'s other

petition described above (hence limiting the content of the pleadings to a mix of obscure

proclamations, quasi-legalese and misspelled and misconstrued Latin terms indicating M.K.'s

conflation of his seemingly-under-way criminal prosecution with his instant applications for a

"writ of habeas corpus emergency!"[32]  Same as in Habeas - I, the habeas-like part of the Habeas -

II pleadings concludes with a request for "a temporary restraining order," this time to "bar[]

respondents from further [d]epriving [M.K.] of any and all rights guaranteed and secured by the

Constitution for [sic.] the United States of America Republic."  Id.. at 4.

Yet, while effectively identical -- in its habeas-like part of the pleadings -- to Habeas - I,

this part of the submission comes accompanied by an elaborate set of attachments.  Specifically,

the submission includes: (a) a "record certification by body custodian" of an unidentified

"trademark notice," produced by the Aboriginal Law Firm; (b) a page having a solid black square

---

[32]  E.g., utilizing Latin phrase "nolle prosequi" and the phrase "tacti procuration" (which,
the Court presumes, is a misspelled phrase "tacit procuration" standing for an implied grant of
power of attorney), M.K., somehow, arrives at the conclusion that respondents' failure to answer
to his habeas pleadings should be construed as the respondents' failure to prosecute his criminal
charges.  See Habeas - II, Docket Entry No. 1, at 2.

**Page 38 of  83**

printed on it; (c) a two-page document titled  "verified declaration in the nature of an affidavit of truth in commerce, and contract for waiver of tort/trademark notice/affidavit of fact," with each page bearing the letterhead of the Aboriginal Law Firm and a page-wide-in-diameter logo of the Aboriginal Law Firm, stamped over the body of the text, the content of which is hard to comprehend due to heavy injection of "Marrakush"-type lingo; (d) an apostille certifying an unspecified document; (e) two pages of "Marrakush"-lingo document having the heading "All Rights to Travel Reserved" and displaying a page-wide sketch of the world map, styled akin to the  Hobo-Dyre Equal Area Projection, Africa-centered version,[33] drawn over the text; (f) a five-page complaint identical to that filed in Marrakush Society v. Township of Willingboro, 09-3392 (JBS) (D.N.J.);[34] and (g) four "criminal complaint warrants," virtually identical to those submitted in the Florida Action - VI matter.

### b.    *Willingboro* **Cluster of Actions**

#### i.    *Civil Action No. 09-2522*

The Civil Action No. 09-3371 was commenced on May 22, 2009, and the submission in that matter was a hefty package of seventy-three pages.  See Marrakush Society v. Township of Willingboro, 09-2522 (JBS) (D.N.J.).  The package contains a copy of the familiar "cover letter," *nine* separate civil complaints and twenty-six pages of attachments.  See id., Docket Entries 1 to 1-13.

---

[33]  The Hobo-Dyer Equal Area Projection is a "south-up" depiction of the world map, with the size of North American and European continents reduced -- in comparison to a conventional map -- in order to reflect the actual size of these continents.  See Ward Kaiser And Bob Abramms, Seeing Through Maps: Many Ways to See the World 26 (2004).

[34]  Marrakush Society v. Township of Willingboro, 09-3392 (JBS) (D.N.J.) is discussed infra, in the Willingboro Actions Section.

The task of reading any of these nine complaints is indeed a daunting one, since each document is heavily laden with the usual indulgences in Hijri calendar, lengthy attributes and equally lengthy designations of locales (composed out of Earth coordinates and references to imaginary "principalities" and "territories") and odd utilizations of common English words, e.g., references to the litigants' bodies as their "Solar Vessels."  See generally, id.  This Court's brief review of the nine complaints suggest that the first complaint expresses M.K.'s disappointment for being requested to produce his driver's licence and insurance when he was stopped by a traffic police officer more than seven years ago, that is, on May 2, 2002.  See id.., Docket Entry No. 1. The second complaint seemingly expresses M.K.'s challenge to a stop-and-frisk incident that took place about nine years ago, that is, in 2000.  See id., Docket Entry No. 1-2.  The third complaint appears to describe the events of March 27, 2009, when the litigant -- whose name is not clarified and cannot be gathered from the signature, but who asserts that he was driving his car while having K.S. as a passenger -- was stopped for driving through a stop sign and arrested upon his admission that he was driving without a state-issued driver's license.[35]  See id., Docket Entry No. 1-3.   The fourth complaint seems to set forth virtually the same set of allegations, but describing the March 27, 2009, events from the point of view of K.S. and asserting that M.K. was the driver of the car.  See id., Docket Entry No. 1-4.  The remaining five complaints -- two of which bear the title "additional complaint" -- seem to describe September 23, 2002, and January 2, 2008, interactions between M.K. and/or K.S. and New Jersey police officers,

---

[35]  This complaint also supplies M.K.'s opinions as to the arresting officers' superpowers, reading, "[the officers were] aiming infrared beams at [K.S.]," and details of K.S.'s interactions with police officers, i.e., K.S's response to the police officer who directed K.S. to remove K.S's footwear: "You do it for me, Civil Servant, I am handcuffed."  See Marrakush Society v. Township of Willingboro,  09-2522, Docket Entry No. 1-3, at 3, 5.

paraphrasing the fact of M.K. or K.S. being approached by a police officer as the officer's "trespass" on M.K./K.S.'s "Solar Vessels."  See id., Docket Entries Nos. 1-4 to 1-6.

These nine complaints are accompanied by M.K.'s in forma pauperis application, asserting -- in direct contradiction to the statements made in the Habeas - I and Habeas - II matters, that M.K. is not incarcerated.  See id., Docket Entry No. 1-7, at 1.  The remaining pages, short of the last one, present a set of: (a) eight homemade documents titled "color of law - misconduct complaint," which are effectively identical to the already familiar "criminal complaint warrants" (in the sense that these documents are seeking arrest of the defendants); and (b) four documents titled "civil application - misconduct complaint" (differing from the prior set by omission of the request to arrest the defendants), plus copies of the Mercer County clerk's certifications of unspecified documents.  See id., Docket Entries Nos. 1-8 to 1-12.

### ii.      Civil Action No. 09-3503

The submission made in Civil Action No. 09-3503, commenced on June 5, 2009,  see Marrakush Society v. Township of Willingboro,  09-3503 (JBS) (D.N.J.), is even more voluminous than the above-discussed Civil Action No. 09-2522, but it does not mean that it is of more value.  The submission includes, as usual, the familiar "cover letter" and an in forma pauperis application, see id., Docket Entry No. 1-6, plus fourteen individual complaints and forty pages of attachments.  See id.

All but one of the fourteen complaints submitted in Civil Action No. 09-3503 repeat, sometimes more than once, the complaints submitted in Civil Action No. 09-2522.  Specifically:

(a)      the first complaint in 09-2522 is replicated as the ninth complaint in 09-3503;
(b)      the second complaint in 09-2522 is replicated as the seventh complaint in 09-3503;
(c)      the third complaint in 09-2522 is replicated as the first complaint in 09-3503;

(d)     the fourth complaint in 09-2522 is also the fourth complaint in 09-3503;

(e)     the fifth complaint in 09-2522 is replicated as the tenth complaint in 09-3503;

(f)     the sixth complaint in 09-2522 is replicated twice as the second and as the third complaints in 09-3503;

(g)     the seventh complaint in 09-2522 is also replicated twice, as the sixth and as the eleventh complaints in 09-3503;

(h)     the eighth complaint in 09-2522 is similarly replicated twice, as the fifth and as the twelfth complaints in 09-3503; and finally

(i)     the ninth complaint in 09-2522 is, too, replicated twice as the thirteenth and the fourteenth complaints in 09-3503.

Which, in turn, renders the eighth complaint submitted in Civil Action No. 09-3503 the sole "new" complaint. A two-page submission, this eighth complaint is filled with the Plaintiffs' usual lengthy geographic designations concocted out of Earth coordinates and imaginary "principalities" and "territories," references to their "Solar Vessels" and obscured lingo. See id. Docket Entry No. 1, at 31-32. The accompanying in forma pauperis application is executed on behalf of the Marrakush Society and informs the Court that the Marrakush Society is not incarcerated and unemployed, and supports the livelihood of itself, as well as of K.S. and M.K. See id., Docket Entry No. 1-4.

The package completes with: (a) three familiar "criminal complaint warrants" seeking the defendants' arrest; (b) twenty equally familiar "color of law - misconduct complaints," also seeking the defendants' arrest; (c) fifteen familiar "civil action warrants" seeking both arrests of the defendants and a $20,000,000 bond from each defendant, to be paid as a remedy to the Plaintiffs; and (d) two certifications of unspecified documents issued by the clerk of the Mercer County. See Docket Entry No. 1-5.

### iii.     *Civil Action No. 09-3392*

Initiated on July 10, 2009, <u>Marrakush Society v. Township of Willingboro</u>,  09-3392

(JBS) (D.N.J.), presents the Court with an even less comprehensible package, since the

submission made in this matter consists of: (a) three-and-a-half pages of an unfinished -- literally,

in the sense of being stopped in the middle of discussion -- complaint describing what appears to

be an interaction between M.K. and K.S. and the police officials on or about July 13, 2009,

during which the police officers seemingly questioned M.K.'s assertions that "Shyaam" was a

"real name" and that M.K. was a "real attorney"; (b) a copy of the "writ of habeas corpus

emergency! petition" submitted in the above-described <u>Habeas - II</u> matter, as well as the

attachments submitted in that matter, <u>i.e.</u>, the apostille, "copy certification by document

custodian," "all rights to travel reserved" documents decorated with a Hobo-Dyer-styled drawing

of the world map; (c) fourteen familiar "civil action warrants" seeking the defendants' arrest and

$20 million bond from each defendant; and (d) fourteen documents titled "trade dress

infringement civil action warrant," identical in their content -- that is, short of the heading -- to

the "civil action warrants" (that are a constant feature of all actions commenced by the

Marrakush Society and/or the Aboriginal Law Firm) and also identical -- short of the order of the

words in the title -- to "civil action-trade dress infringement-complaint-warrants" submitted in

<u>Florida Action - IV</u> and <u>Florida Action - V</u>.  <u>See</u> <u>id.</u>, Docket Entries 1 to 1-3.

This submission arrived unaccompanied by either a filing fee or by an <u>in</u> <u>forma</u> <u>pauperis</u>

application, seemingly with intent to have the submission simply docketed for the Plaintiffs'

record.

c.      *Westampton* Cluster of Actions

i.      *Civil Action No. 09-2521*

The matter <u>Marrakush Society v. Township of Westampton</u>, 09-2521 (JBS) (D.N.J.) was commenced on May 22, 2009, that is, on the day when the Marrakush Society initiated its first six actions in this District.

In this matter, the Plaintiffs submitted two individual complaints. See <u>id.</u>, Docket Entries Nos. 1 and 1-6. The first complaint (containing the usual chain of lengthy attributes and geographic designations composed out of Earth coordinates, sea levels, imaginary "principalities" and "territories," references to Hijri calendar and to the Plaintiffs' "Solar Vessels," and obscured lingo) appears to describe the events of April 10, 2006, when M.K. was requested to show the policeman M.K.'s driver's license, pat-frisked upon his failure to produce a state-issued identification and fingerprinted later on. See <u>id.</u> Docket Entry No. 1, at 1-2. This first complaint is accompanied by M.K.'s <u>in forma pauperis</u> application, informing the Court that M.K. is not incarcerated. See <u>id.</u>, Docket Entry No. 1-3. The Mercer County clerk's certificates of unspecified documents and four familiar "color of law - misconduct complaints" demanding defendants' arrest and $20 million bond complete the set. See <u>id.</u>, Docket Entry No. 1-4.

The second complaint -- largely identical in its style and claims to the first complaint-- relates the events of February 14, 2008, and supplements the above-described narrative by an assertion that -- upon refusal to disclose to the officer his social security number -- M.K. was extorted of twelve hundred dollars which he, allegedly, was carrying in his pocket at the time of the incident. See <u>id.</u>, Docket Entry No. 1-6. This second complaint arrived accompanied by the familiar "cover letter." See <u>id.</u> at 5.

ii.      *Civil Action No. 09-3342*

On June 5, 2009, that is, less than two weeks after the Plaintiffs initiated the above-described  Civil Action No. 09-2521, the Clerk received from the Plaintiffs another submission and opened the 09-3342 matter.  See Marrakush Society v. Township of Westampton,  09-3442 (JBS) (D.N.J.).

That new submission consisted of: (a) a complaint replicating the second complaint in the above-described Civil Action No. 09-2521; (b) M.K.'s in forma pauperis application; (c) the same familiar "cover letter"; (d) two familiar "civil action warrants" seeking defendants' arrest and $20 million bond from each of them; and (e) one familiar "criminal complaint warrant" seeking defendants' arrest but no monetary bonds.  See id., Docket Entries Nos. 1 to 1-3.

iii.      *Civil Action No. 09-3341*

Initiated exactly one month later, Marrakush Society v. Township of Westampton,  09-3441 (JBS) (D.N.J.), differed from the above-described Civil Action No. 09-3342 in the following respects: (a) instead of replicating the second complaint in Civil Action No. 09-2521, this submission replicated the first complaint in Civil Action No. 09-2521; and (b) instead of three "civil action warrants," this submission included two "civil action warrants" and two familiar "color of law - misconduct complaints" that merely sought the defendants' arrest, without $20 million bonds.  See id., Docket Entries Nos. 1 and 1-5.  Plus, the submission included M.K.'s in forma pauperis application and the familiar "cover letter."  See id., Docket Entries Nos. 3 and 4.

c.     *Pensville* **Set of Actions**

i.     *Civil Action No. 09-3342*

The situation with the Westampton set of actions is virtually identical to that of the Pensville set of actions.  Same as in the Westampton scenario, the first Pensville pleadings were submitted on May 22, 2009, being among the first six actions initiated by the Plaintiffs in this District.  See Marrakush Society v. Township of Pennsville,  09-2519 (JBS) (D.N.J.).

This initial submission included: (a)  a copy of the familiar "cover letter," see id., Docket Entry No. 1, at 3; (b) an unsigned in forma pauperis application of the Marrakush Society, see id., Docket Entry No. 1-3; (c) one familiar "color of law -- misconduct complaint" demanding defendants' arrest and one "civil application - misconduct complaint" not containing such demand, plus two certifications of unspecified documents by the Mercer County clerk's office; and (d) a complaint signed by M.K. and set forth in the usual style of lengthy attributes, oddly concocted geographic designations and obscure parlance.[36]  See id., Docket Entry No. 1, at 1-2.

ii.     *Civil Action No. 09-3502*

Submitted less than two weeks after, the second Pensville action, i.e., Marrakush Society v. Township of Pennsville,  09-3502 (JBS) (D.N.J.), presented the Court with practically a repeat of the first Pensville action.  Indeed, in this second action, the Marrakush Society submitted: (a) an in forma pauperis application (although, this time, it was signed by M.K.); (b) the very same familiar "cover letter"; and (c) the very same complaint that was submitted in the above-

---

[36]  The complaint seemingly asserts that, on an unspecified date of November 2007, M.K. was stopped by a police officer upon driving through "a wrong entrance" and, consequently, was asked to produce his driver's licence.  See Marrakush Society v. Township of Pennsville,  09-2519, Docket Entry No. 1.

described Civil Action No. 09-3342.  See id., Docket Entry No. 1 at 1-3, Docket Entries Nos. 1-2

and 1-4.  The distinction between the first and second Pensville action was limited to: (a) the fact

that, instead of one "color of law -- misconduct complaint" and one "civil application -

misconduct complaint" attached to the first package, the second package contained one familiar

"civil action warrant" demanding both arrest of the defendants and $20 million bond from each

of them and one familiar "criminal complaint warrant" that sought only defendants' arrest but no

such bond, see id., Docket Entry 1-2; plus (b) another copy of the complaint already reproduced

twice in the Willingboro cluster of actions, i.e., the complaint submitted as the third complaint in

the batch of nine in Marrakush Society v. Township of Willingboro,  09-2522 (JBS) (D.N.J.),

and also re-submitted as the first complaint in the batch of fourteen pleadings submitted in

Marrakush Society v. Township of Willingboro,  09-3503 (JBS) (D.N.J.).

### d.   *Mount Laurel* Set of Actions

#### i.   *Civil Action No. 09-2520*

Marrakush Society v. Township of Mount Laurel,  09-2520 (JBS) (D.N.J.), was initiated

on May 22, 2009, among the first six actions commenced by the Plaintiffs in this District.  This

twenty-eight page submission included: (a) the Marrakush Society's application to proceed

in forma pauperis, signed by M.K.; (b) the familiar "cover letter"; (c) seven "color of law -

misconduct complaints" demanding the defendants' arrest; (d) the Mercer County clerk's

certifications of unclear which documents; and (e) two complaints, paraphrased in "Marrakush"

language of lengthy attributes and geographic destinations and odd lingo.[37]

---

[37]  For instance, same as in other actions initiated by the Marrakush Society,"the phrase
"Solar Vessel" was used to designate the plaintiff's body, "Solar Plexus" seemed to designate the
plaintiff's head, the term "Carpomedicarpols" appeared to designate the plaintiff's arms, the

Substantively, the first complaint asserted that, on October 24, 2007, M.K. was asked by a police officer to produce his driver's licence and registration, and -- upon his refusal to state his actual address -- was directed to step out of the car and taken to a police precinct.  See id., Docket Entry No. 1, at 1-4.  The second complaint described the very same events, but seemed to articulate them from the point of view of K.S., who allegedly was a passenger in M.K.'s car during the incident  See id. at 5-9.

### ii.  *Civil Action No. 09-3507*

The second Mount Laurel action, see Marrakush Society v. Township of Mount Laurel, 09-3507 (JBS) (D.N.J.), differs little from the first one.  The Plaintiffs' submission in that matter contains: (a) the same familiar "cover letter"; (b) the same the Marrakush Society's application to proceed in forma pauperis signed by M.K.; and (c) a complaint identical to the first complaint in the above-described Civil Action No. 09-2520.  See id., Docket Entry No. 1, at 1-4; Docket Entries Nos. 1-3 and 1-4.  The difference between the first and the second submissions is limited to:

(a)     substitution of the second complaint, that is, the complaint expressing K.S.'s perception of the events with a one paragraph complaint asserting that the township of Mount Lauren "authorized" the issuance of a "fraudulent security instrument," see id., Docket Entry No. 5; and

---

phrase "Five Star Traveler"was utilized to designate the plaintiff's companions, while the "Vessel of Conveyance" seemed to designate a police car, and the expression "commandeering the Mobile Vessel" seemed to imply that the plaintiff was driving, while the expression "drenching my Solar Vessel in unnatural water" appeared to state that the plaintiff was directed to take a shower, etc.  See Marrakush Society v. Township of Mount Laurel,  09-2520 Docket Entries Nos. 1 to 1-4.

(b)    substitution of the seven "color of law - misconduct complaints" (submitted in the first

Mount Laurel action) with: (i) two familiar "civil action warrants" seeking both

defendants' arrest and $20 million bond; and (ii) seven familiar "criminal complaint

warrants," each seeking arrest of the defendants but no monetary bond.  See id., Docket

Entry No. 1-5.

### e.    *Mansfield* Set of Actions

#### i.    *Civil Action No. 09-2518*

Marrakush Society v. New Jersey State Police, 09-2518 (JBS) (D.N.J.), was the first case

from the initial batch of six actions commenced by the Plaintiffs in this District.  Package-wise,

this submission contained mostly the usual set of documents typical to all submissions made by

the Marrakush Society and/or the Aboriginal Law Firm, i.e., it contained: (a) the usual in forma

pauperis application, signed by M.K. but executed on behalf of the Marrakush Society, alleging

that the Marrakush Society is both non-incarcerated and unemployed; (b) one familiar "color of

law - misconduct complaint" addressed to numerous identified and unidentified prosecutor's

offices, the FBI and the President, and demanding arrest of the defendants; and (c) two familiar

"civil application - misconduct complaints," analogously addressed but not seeking defendants'

arrest; plus (d) a certification of an unspecified document issued by the Mercer County clerk.

See id., Docket Entries Nos. 1-4 to 1-6.

    The factual allegations set forth in the complaint and in the accompanying "Bill of

Allegations" appear instructive.  The complaint alleged as follows:

> On the Twenty Seventh day of Shawwal, in the year One Thousand Four Hundred
> and Twenty Nine, Murakush calendar, . . . between 2100 Hours and 0200 Hours, I
> was accosted while traveling North East in a Mobile Vessel, within the

Marankokush Principality, in the Timbuctoo Territory, of the Samal Shariq Abeka
Region; Samal Marika, at approximately between Earth Coordinates 40°
2'41.83"N. 74° 50'3.44"W, and 40° 7'17.16"N. 74° 43'8.09"W; at a Sea Level of
approximately 15.24 Meters, to 21.336 Meters, by an unidentified STATE OF
NEW JERSEY Driver. and Agent for the Defendant ihe NEW JERSEY STATE
POLICE for the Defendant the STATE Of NEW JERSEY (Herein after referred to
as JOHN DOE). JOHN DOE engaged the Mobile Vessel I was commandeering,
and demanded to see a "Drivers License, Registration, and Insurance Card". I
presented JOHN DOE with a World Service Administration Passport, issued from
World Service Authority; relative to my Identification, and Insurance and
Registration of the Mobile Vessel, I was traveling in. I asked JOHN DOE "what is
the probable cause?" JOHN DOE stated that the probable cause for interrupting
my travels was that he believed he saw me talking on a Cellular
Telecommunication Device.  JOHN DOE maneuvered his way to the Vessel or
conveyance he was driving, along with the Instruments that I presented to him.
JOHN DOE returned in the Mobile Vessel or Conveyance that I was
commandeering, and said "step out of the car."  I replied "what for"?  JOHN DOE
replied "step out of the car sir." Under Threat, Duress, and Coercion I exited the
Mobile Vessel for the reason and purpose of not being physically harmed, battered
and abused.  Upon exiting the Mobile Vessel, JOHN DOE, and another
unidentified agent for the Defendant the NEW JERSEY STATE POLICE,
grabbed the arms of my Solar Vessel and chained the Carpomedicarpols of my
Solar Vessel together.  My Solar Vessel was trafficked to the right side of a Vessel
or conveyance, bearing the Corporate Name "NEW JERSEY STATE POLICE".
While being harbored on the right side of the Vessel or conveyance bearing the
Corporate Name "NEW JERSEY STATE POLICE" I asked JOHN DOE why he
was arresting me?  He stated that there was a warrant under the "Name" Shyaam
and began to use his hands to examine the pockets attached to the trousers and
coat covering my Solar Vessel.  He also used his hands to examine the Indigenous
genital areas of my Solar Vessel.  Upon completion of his examination, my Solar
Vessel was then forced into the back of a Vessel or conveyance bearing the
Corporate Name "NEW JERSEY STATE POLICE", and trafficked to a fixture
being administered by the Defendant the NEW JERSEY STATE POLICE:
domiciled within the Shecabee Principality in the Zankikan Territory, of the
Samal Shariq Abeka Region; Samal Marika. at approximalely Earth Coordinates:
40° 8'59.78"N. 74° 42'2.49"W at a Sea Level of approximately 18.8976 Meters.
My Solar Vessel was trafficked to a room within the fixture being administered by
the Defendant the NEW JERSEY STATE POLICE.  The Carpomedicarpols of my
Solar Vessel were chained, and shackled to a small wooded rail within this room.
Soon after, JOHN DOR used his hands in examine the clothing on my Solar
Vessel, and the Indigenous genital areas of my Solar Vessel again without my
consent.  After a few minutes JOHN DOE. entered the small room, and gave me a
small carded instrument to read.  He demanded that I read it.  I declined, and then

> he exited the room. I sat on the wooded rail . . . and then my Solar Vessel was trafficked to a fixture domiciled within the Marankokush Principality, in the Timbuctoo Territory, of the Samal Shariq Abcka Region, Samal Marika, at Earth Coordinates: 39° 59'45.73"N, 74° 4727.25"W; at a Sea Level of precisely 10.0584 Meters, being administered by the BURLINGTON COUNTY JAIL or BURLINGTON COUNTY DETENTION CENTER.

Id. Docket Entry No. 1, at 1-3 (punctuation and capitalization in original).[38]

Although it appears that the events described in the complaint suggest that M.K., upon his failure to produce a valid identification and licence, was merely ordered out of his car and brought into custody without any violence, the accompanying "Bill of Allegations" contains four "counts," each asserting, with small variations, that these very same events should be construed as indicative of the policeman's: (a) usage of excessive force; (b) resort to "discrimination" and performance of a false arrest (c) "coersive sexual conduct" and "aggravated sexual abuse" of M.K.; and even (d) an attempt to kidnap M.K. and to kill him.  See id., Docket Entry No. 1-2.

---

[38] "World Passports," issued by the so-called World Service Authority ("WSA"), are not recognized as drivers' licenses or for other governmental purposes in the United States.  A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states. See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006). WSA has been promoting "world citizenship" by issuing so-called "world passport" (similar in their appearance to regular national passports) to any person who wanted to declare himself/herself "a citizen of the world," and one can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.worldgovernment.org/>>. While these "world passports" could occasionally be accepted, on a case-by-case basis, by some countries, the United States -- and many other nations -- systemically stated that "world passports" were not cognizable documents. See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/master docs/07fam/07m1310.pdf>>.

####    ii.    *Civil Action No. 09-3505*

While initiated about two weeks after Civil Action No. 09-2518, <u>Marrakush Society v.</u> <u>Township of Mansfield</u>, 09-3505 (JBS) (D.N.J.), presented the Court with a virtually identical package, since the submission made in this later action contained: (a) two copies of the complaint already submitted in Civil Action No. 09-2518, <u>see</u> <u>id.</u> Docket Entry No. 1; (b) a repeat of the familiar "cover letter," <u>see</u> <u>id.</u>, Docket Entry No. 1-2; and (c) the same in forma pauperis application executed on behalf of the Marrakush Society, alleging that the Marrakush Society is both non-incarcerated and unemployed, and financially supports itself, as well as K.S. and M.K. <u>See</u> <u>id.</u>, Docket Entry No. 1-4.  The sole distinction between these <u>Mansfield</u> actions was limited to the absence of any "Bill of Allegations" and a substitution of the familiar "color of law - misconduct complaint" and "civil application - misconduct complaints" used in Civil Action No. 09-2518 by an equally familiar "civil action warrant" that sought not just the defendants' arrest but also $20 million bond from each defendant.  <u>See</u> <u>id.</u> Docket Entry No. 1-5.

####    f.    **Non-duplicative Pleadings Styled as Civil Rights Allegations**

In light of the foregoing, only five actions -- out of the seventeen civil rights actions commenced by the Plaintiffs in this District -- were not initiated duplicatively. The Court will address these remaining five actions in the order of their submission by the Plaintiffs.

####    i.    *Civil Action No. 09-3504*

Content-wise, the package submitted in <u>Marrakush Society v. Burlington County Jail</u>, 09-3504 (JBS) (D.N.J.), corresponds to all other submissions made by the Marrakush Society and/or the Aboriginal Law Firm, since it contains copies of familiar "cover letter," "civil action warrant" and the Marrakush Society's <u>in</u> <u>forma</u> <u>pauperis</u> application, <u>see</u> <u>id.</u>, Docket Entries Nos. 1-2 to

1-5, as well as a complaint filled with euphemisms, lengthy attributes, odd geographic

designations and assertions suggesting that, in M.K.'s opinion, any action by police officers

necessarily violate M.K.'s rights under the "laws," as perceived by M.K.[39]   See id., Docket Entry

No. 1.

## ii.   *Civil Action No. 09-3506*

The submission made in <u>Marrakush Society v. Superior Court of New Jersey</u>, 09-3506

(JBS) (D.N.J.), provides the Court with another complaint composed of nothing but M.K.'s

self-serving conclusory statements.[40]   This factless complaint is accompanied by nineteen

familiar "civil action warrants" seeking arrest of all the defendants and $20 million bonds.   <u>See</u>

<u>id.</u> Docket Entry No. 1-2.   As usual, the submission includes the familiar "cover letter"and the

Marrakush Society's <u>in</u> <u>forma</u> <u>pauperis</u> application.

---

[39]   For instance, the complaint relates the events of M.K. brief booking -- on the
Willingboro charges -- in the Burlington County Jail, upon entry of which M.K. was searched,
directed to take a shower (the process described by him as "drenching" M.K.'s "Solar Vessel in
unnatural waters"), requested to be photographed and to produce his fingerprints (which M.K.,
apparently, refused, initially asserting that there was no statutes so requiring but, after being read
the state law to that effect, re-refused on the grounds that "Statutes are not Laws").   The
complaint also states that M.K. refused to disclose his actual name, but a summons was
seemingly issued to him under the name "Brandon Casimir," since one of the prison officials
recognized M.K. as his former classmate. See <u>Marrakush Society v. Burlington County Jail</u>,
09-3504 (D.N.J.), Docket Entry No. 1.

[40]   For instance, naming, as defendants the following entities -- the Superior Court of New
Jersey, "Burlington County Vicinage," Burlington County Prosecutors Office, Burlington County
Bar Association, New Jersey State Bar Association, Patricia Richmond Lebon, Robert D.
Bernardi and Michael Luciano, the complaint repeats, as the allegation against each of these
defendants, the same sole sentence, reading: "[t]he accused conspired to and did deprive me of
my inalienable rights secured to me by the Constitution and the Laws of the United States of
America," without adding a shred of factual allegations.   See <u>id.</u>, Docket Entry No. 1.

###### iii.   *Bey* Line of Cases

The three latest submissions listing the Marrakush Society as the plaintiff were received by the Clerk on July 20, 2009.  See Marrakush Society v. Township of Vineland,  09-3589 (JBS) (D.N.J.); Marrakush Society v. Township of New Jersey State Police, 09-3590 (JBS) (D.N.J.); Marrakush Society v. Township of Newfield,  09-3591 (JBS) (D.N.J.) (collectively, "Bey Line of Cases").  These submissions differ slightly from the above-described fourteen civil actions commenced by the Marrakush Society and/or the Aboriginal Law Firm on the basis of complaints and/or in forma pauperis applications signed by M.K. or K.S. (collectively "M.K./K.S. Line of Cases"), in the sense that these documents were signed by Bey.

The key similarity between the M.K./K.S. and Bey Lines of Cases is that the complaints name, as the plaintiff, the Marrakush Society, and these submissions use the same boilerplate, including utilization of Hijri calendar, geographic designations concocted out of references to Earth coordinates, sea levels and imaginary "principalities" and "territories" and odd terminology.  See Marrakush Society v. Township of Vineland,  09-3589, Docket Entry No. 1; Marrakush Society v. Township of New Jersey State Police, 09-3590, Docket Entry No. 1; Marrakush Society v. Township of Newfield,  09-3591, Docket Entry No. 1.

Moreover, same as in the M.K./K.S. Line of Cases, submissions made by Bey include multiple complaints in a single matter.  See Marrakush Society v. Township of Vineland,  09-3589, Docket Entry No. 1 (featuring three complaints describing entirely different transactions).[41]

---

[41]  Two complaints appear to describe the events of November 3, 2008 (when Bey was asked by a traffic policemen to produce his driver's licence and, either before or after that, asked to produce a state-issued identification and was taken for fingerprinting and photographing at a police precinct), and the third complaint seemingly alleged that, on October 11, 2008, upon Bey's failure to produce a state-issued driver's licence, he was taking for booking, frisked his entire

In addition, Bey's submission in <u>Marrakush Society v. Township of Newfield</u>,  09-3591, arrived

accompanied by familiar fifty-six "civil action warrants" seeking defendants' arrest and a $20

million bond, <u>see</u> <u>id.</u>, Docket Entries No. 1 and 2, and the submissions made by Bey in Civil

Actions Nos. 09-3589 and 09-3590, was supplemented on July 27, 2009, to add the total of forty

one more "civil action warrants,"[42] <u>see</u> <u>id.</u>, Docket Entry No. 2 (reflecting twenty "warrants" in

Actions Nos. 09-3590 and twenty one "warrants" in Actions Nos. 09-3589).

　　　　The submissions made in <u>Bey</u> Line of Cases arrived unaccompanied by any application to

proceed <u>in</u> <u>forma</u> <u>pauperis</u>.  Also, the language of the "cover letter" used in the <u>M.K./K.S.</u> Line of

Cases (<u>i.e.</u>, the letter listing apostilles and the entries in miscellaneous books maintained by New

Jersey and Florida counties, and ending with "Always in Honor!") was changed in the <u>Bey</u> Line

of Cases.  Specifically, while maintaining the Aboriginal Law Firm's letterhead, the "cover letter"

submitted now read as follows:

> Please be advised that all Title I8 criminal warrants are acknowledged, submitted
> by this firm in connection with the *Universal Declaration of Human Rights,* the
> *International Covenant on Civil and Political Rights, Rotella v. Wood* and must
> be filed accordingly pursuant to Article IV of the United States Republic
> Constitution in accordance with Rule(s) 2, 3, 4, 49 and 56 of the Federal Rules of

---

body from his ankles to hands (which Bey construed as a sexual assault) and informed him that
there was an outstanding warrant for Scott McArthur (the official identity of Bey presumed by
the police).  <u>See</u> <u>Marrakush Society v. Township of Vineland</u>,  09-3589, Docket Entry No. 1.

　　　[42]  Three of which were repeated demand for arrest of – and $20 million bond from – the
"Buena Municipal Court," three others made the same demands as to the "Buena Vista
Township," two of which made that demand as to the "Atlantic County Prosecutor [sic.] Office,"
five others made that demand as to "William S. Cappuccio," other five demanded the same as to
"John Doe" (although providing two different addresses of this unidentified John Doe) and yet
two other sought the same as to "New Jersey State Police Department," <u>see</u> <u>Marrakush Society v.</u>
<u>Township of New Jersey State Police</u>, 09-3590, Docket Entry No. 2, even though only one "John
Doe" and the "New Jersey State Police" were named as defendants in the complaint.  <u>See</u> <u>id.</u>,
Docket Entry No. 1.

> **Criminal** Procedure.  The commencement of these public actions are in relation to an investigation regarding Deprivation of Rights Secured by International Treaties and the Constitution of the United States and violations of Title 18 U.S.C. 1961(1)(A)(B). (5); 18 U.S.C. 1962; and 18 U.S.C. 1964.

Marrakush Society v. Township of Vineland,  09-3589, Docket Entry No. 1-2 (italics, bold lettering and capitalization in original); Marrakush Society v. Township of New Jersey State Police, 09-3590, Docket Entry No. 1-3 (same); Marrakush Society v. Township of Newfield,  09-3591, Docket Entry No. 1-2 (same).

## IV.    SUMMARY OF DEFICIENCIES OF THE MATTERS BEFORE THE COURT

The foregoing discussion makes it apparent that submissions made in the above-captioned actions suffer of numerous deficiencies.  For instance, in complete disregard of the guidance provided to the Plaintiffs by the judges in the Southern District of Florida, the Plaintiffs keep filing their civil complaints naming the Marrakush Society as the plaintiff but without submission of filing fees: they substitute the filing fees with in forma pauperis applications of private persons.  Moreover, the in forma pauperis applications signed by M.K. assert that the applicant is not incarcerated, while M.K. habeas petitions seek his release from confinement.

Furthermore, all applications are submitted on the letterhead or with a reference to the Aboriginal Law Firm, creating an impression that the Aboriginal Law Firm is the Plaintiffs' counsel.  However, notices of appearance by attorneys actually admitted to the bar and to practice before this Court have not been submitted, and the information released by the Aboriginal Law Firm in public domain causes substantial doubts even as to the legitimacy of the Aboriginal Law Firm as a juridical entity.  The same concerns are raised by the information released in public domain by the Marrakush Society, which appears to be but a group of social acquaintances rather

than an actual juridical entity having standing to sue on its own behalf.  Additional concerns are raised by the Marrakush Society's allegations that assert claims of third parties.

Moreover, a number of actions at hand contains more than one -- and, occasionally, up to fourteen -- sets of pleadings, in violation of Local Rule 7 (specifying that an action must be commenced by the filing of "a" complaint, in singular).  Furthermore, even if these complaints are construed as parts of the same submission, they fail to meet the requirements posed by Rules 18 and 20 of the Federal Rules of Civil Procedure.  To add to the problem, the bulk of above-captioned actions appear to be duplicative of each other.  In addition, the civil complaints docketed in these matters systemically seek arrest of the defendants and initiation of criminal proceedings against them.  Finally, the complaints are executed in a nearly incomprehensible made-up, foreign and obscure language, contain factless self-serving conclusory statements and fail to meet the pleading requirements of Rule 8 (even though these requirements were explained and re-explained to the Plaintiffs by the Southern District of Florida); this obscure language presents a stark contrast to that used in the video clips released by the Aboriginal Law Firm, described above.  See supra, Part II, Section "Ning Webpage and YouTube Videos."

The two habeas applications in this grouping fare no better.  These applications fail to clarify either the basis for this Court's jurisdiction or even the judgment of conviction they are intended to challenge.  Moreover, these applications fail to articulate either a cognizable or even a comprehensible claim, in violation of the Habeas Rules.  In addition, the applications appear wholly unexhausted, and M.K., the author of these submissions, asserts that he is not in custody for the purpose of his in forma pauperis statements.  Finally, the petitions appear duplicative.

In light of the foregoing, the Court finds it useful to provide the Plaintiffs with guidance as to the aforesaid deficiencies in order to: (a) allow the Plaintiffs an opportunity to cure their legal practices; and (b) to put the Plaintiffs on notice of what the courts expect from their legal submissions and the likely dire consequences of the Plaintiffs' failure to meet these expectations.

## V.   GUIDANCE WITH RESPECT TO CIVIL ACTIONS

### A.   PROCEEDING IN FORMA PAUPERIS

The point the most often explained and re-explained to the Plaintiffs by Judges Gold, Ungaro, Dimitrouleas and Hurley was that a juridical entity, like the Marrakush Society or the Aboriginal Law Firm (that is, presuming that they are actually existing juridical entities) cannot prosecute a legal action while appearing in forma pauperis.  After having this point clarified to the Plaintiffs six times by its sister court, this Court finds another repetition of the same wholly redundant.[43]  There are, however, a few points to add.  If any of the Plaintiffs seeks to reopen any action currently before the Court or files new civil actions, and this Plaintiff is *a natural person, both impoverished and unincarcerated*, such Plaintiff should attach to his pleadings his completed, signed and dated in forma pauperis form (a copy of which it attached to this Opinion for the Plaintiffs' conveniences) and must be used by those Plaintiffs who are suing in their own name, without prepayment of the filing fee.[44]  See Zaun v. Dobbin, 628 F.2d 990 (7th Cir. 1980).

---

[43]  In the event the Plaintiffs are of opinion that the federal law in this District -- or in the Third Circuit -- differs from the legal regime in the Southern District of Florida, the Plaintiffs err. See, e.g., Move Organization v. United States Dep't of Justice, 555 F. Supp. 684 (E.D. Pa. 1983) (providing a detailed and thoughtful discussion of 28 U.S.C. § 1915(a)); accord Rowland v. California Men's Colony, 506 U.S. 194 (1993) (explaining that only a natural person may qualify for treatment in forma pauperis under § 1915 and binding all federal courts by this holding)

[44]  The Supreme Court held that one need not be absolutely destitute to qualify for in forma pauperis status.  See Adkins v. E. I. DuPont De Nemours & Co., Inc., 335 U.S. 331

Moreover, if an imprisoned person seeks permission to file a civil rights complaint in forma pauperis, the Prison Litigation Reform Act ("PLRA") requires the prisoner (or the pre-trial detainee) to file an affidavit of poverty, certified by an authorized prison official, together with the inmate's prison account statement for the six-month period immediately preceding the filing of the complaint.[45]  See 28 U.S.C. § 1915(a)(2).  Therefore, if M.K. is incarcerated, as he claims

---

(1948).  In Adkins, P. V. Adkins filed a timely motion in district court requesting leave to appeal the district court's decision in forma pauperis and stated, in her affidavit, that she was a widow 74 years of age, that the estimated cost of her record on appeal was $ 4,000, that all she owned was a house inherited from her husband which had been appraised at a value of $ 3,450, and her only source of income was a small rent from parts of her home without which she would not be able to purchase the necessities of life.  The district and appellate courts refused to grant Adkins leave to appeal in forma pauperis because Adkins had not mortgaged her home in order to raise money toward the cost of her appeal.  In sum, the lower courts in Adkins concluded that the affidavit of poverty prerequisite of § 1915 required that a party desiring to proceed in forma pauperis must be able to show by sworn affidavit that (s)he had contributed virtually his/her last dollar to the cost of litigating the suit. The Supreme Court: (a) reversed and ruled that a federal court should not use the affidavit of indigency requirement of § 1915 as a tool to force a party to prove that he is absolutely destitute before allowing that person to proceed in forma pauperis; but (b) clarified that the district court enjoys discretion to determine whether the payment of the fees would be unduly burdensome.  See id; see also Kinney v. Plymouth Rock Squab Co., 236 U.S. 43, 46 (1915).  In light of:(a) M.K.'s statement in Marrakush Society v. Township of Westampton,  09-2521, Docket Entry No. 1-6, at 3, that M.K. was carrying $1,200 in cash in his pocket when he was stopped to have his driver's license checked; and (b) the statement in the Plaintiffs' YouTube videos, i.e., their assertion that they afford to rent an office in the "heart of the Wall Street" (and the accompanying depiction of that office, featuring a large digital or projector screen on the background and a laptop in front of the speaker), the Court notes its uncertainty as to the Plaintiffs' status as paupers and reserves holding a hearing on that issue in the event either M.K or K.S. or Bey submit an in forma pauperis application in the future.

[45]  The PLRA provides that, if the prisoner is granted permission to file the complaint in forma pauperis, then the Court is required to assess the $350.00 filing fee against the prisoner and collect the fee by directing the agency having custody of the prisoner to deduct installment payments from the prisoner's prison account equal to 20% of the preceding month's income credited to the account for each month that the balance of the account exceeds $10.00.  See 28 U.S.C. § 1915(b).  The PLRA also provides that, if a prisoner has, on three or more occasions while incarcerated, brought an action or appeal in a federal court that was dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from immune defendants, then the prisoner may not bring another action in forma

to be in his <u>Habeas - I</u> and <u>Habeas - II</u> submissions, and he wishes to proceed in a civil action <u>in</u> <u>forma</u> <u>pauperis</u>, he should complete a prisoner's <u>in forma</u> <u>pauperis</u> form (attached to this Opinion for M.K.'s convenience) and submit it together with his prison account statement.  <u>See id.</u>

None of the current applications to proceed <u>in</u> <u>forma</u> <u>pauperis</u> conforms to the requirements of law.  The cases will be terminated on this ground, among others.

### B.   REPRESENTATION BY LEGAL COUNSEL

Since the Plaintiffs were already told by the judges in the Southern District of Florida that any juridical entity (meaning, any fictitious/artificial/legal person) cannot appear in legal proceedings <u>pro</u> <u>se</u>, this Court's repetition of the same point seems trite at best.  Consequently, the Plaintiffs are referred to the guidance already provided to them by the Southern District of Florida.  However, one finer point deserves to be stressed.

It appears that -- in light of the decisions rendered by the Southern District of Florida, which guided the Plaintiffs only in general terms, <u>i.e.</u>, by stating that the Marrakush Society may proceed only upon obtaining legal representation -- the Plaintiffs bypassed this crucial point, either innocently or not, by asserting that they have "legal representation" by the Aboriginal Law Firm.  The Plaintiffs err.  "In all courts of the United States the parties may plead and conduct their own cases personally or by *counsel* as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654 (emphasis supplied). The courts have invariably held that this statute "does not allow corporations, partnerships, or associations to appear in federal court otherwise than through a licensed attorney." <u>Rowland v. California Men's Colony</u>, 506 U.S. 194, 202 (1993).   While a duly licensed attorney may

_____

pauperis unless (s)he is in imminent danger of serious physical injury.  <u>See</u> 28 U.S.C. § 1915(g).

contribute to a law firm, see Puckett v. McPhillips Shinbaum, LLP, 2008 U.S. Dist. LEXIS

26215 (M.D. Ala. Mar. 31, 2008), a law firm itself -- as an entity -- cannot qualify as "counsel,"

even if the law firm consists of attorneys admitted to the bar and to practice before a particular

court.  A fortiori, an entity not qualified as an actual law firm cannot represent anyone in the

court of law.  Similarly, a person not duly admitted to legal practice but merely self-describing

himself as an attorney (or using the word "Justice" as his attribute) cannot act as an attorney to

any juridical entity or natural person in the court of law; he can only act as his own counsel.

Hence, neither the Marrakush Society nor M.K., K.S. nor Bey (or any other entity), nor even the

Aboriginal Law Firm itself can be represented by the Aboriginal Law Firm,[46] and M.K. may

represent any of the above only if he is an attorney duly admitted to practice in this District;

otherwise, M.K. can act only represent himself.  Accord Local Civil Rule 11.1 ("In each case, the

attorney of record who is a member of the bar of this Court shall personally signall papers

submitted to the Court or filed with the Clerk").

    Because the Aboriginal Law Firm does not satisfy these requirements, it cannot appear as

an attorney in these cases.

---

[46]  Therefore, the Marrakush Society and/or the Aboriginal Law Firm must -- if they
desire to litigate -- obtain a duly admitted attorney as their legal counsel to commence an action.
While, in some limited circumstances, the Court can appoint a pro bono counsel to represent a
litigant in a civil matter, such appointment is not available to either the Marrakush Society or the
Aboriginal Law Firm because -- as it was discussed in the Proceeding In Forma Pauperis Section
of this Opinion -- neither one of these "entities" may qualify for the in forma pauperis status.  See
United States v. McQuade, 647 F.2d 938, 940 (9th Cir. 1981), cert. denied, 455 U.S. 958 (1982)
(where the litigant fails to satisfy the court that the litigant is qualified an indigent, the litigant is
not entitled to the exceptional remedy of court-appointed counsel in a civil case).

## C. ACTUAL EXISTENCE OF LITIGANT AND STANDING TO SUE

In order to be a litigant in legal proceedings, the litigant -- regardless of whether it is a juridical entity or a natural person -- must actually exist.  "It is elemental that in order to confer jurisdiction on the court the plaintiff must have an actual legal existence, that is he or it must be a person in law or a legal entity with legal capacity to sue.  [The plaintiff cannot be deemed existing if it] is neither a natural nor artificial person, but is merely a name." Isaac v. Mount Sinai Hospital, 3 Conn. App. 598, 600, cert. denied, 494 A.2d 904 (1985) (citing 59 Am. Jur. 2d, Parties, §§ 20, 21); see also De Paul Community Health Center v. Trefts, 688 S.W.2d 379 (Mo. Ct. App. 1985) (a non-existing "entity" has no standing to sue since it has no legally cognizable interest in "its" claims).

A group of social acquaintances, same as a group of contributors of blogs and posts to a joint social webpage, cannot -- without more -- qualify as a juridical entity having standing to sue,[47] regardless of whether the name of the webpage (or the name that these acquaintances gave to themselves as a group) is styled to mimic the names commonly used by juridical entities: a

---

[47] The concept of "standing to sue" ensues from the language of Article III.  An Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III. To satisfy Article III, a plaintiff "must show that (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  Since a suit brought by a plaintiff without Article III standing is not a "case or controversy," an Article III federal court lacks subject matter jurisdiction over the suit.  See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998). In that event, the suit should be dismissed.  See id.

name is not an entity that can initiate a legal suit.[48]   Accord Cetacean Cmty. v. Bush, 386 F.3d

---

[48]   Addressing the issue of the United States government actions aimed at controlling a wide-spread criminal scheme based on the scheme participants' self-legitimization of their names for the purposes of initiating fraudulent legal transactions, the Court of Appeals for the Third Circuit provided the following discussion that appears relevant to the Plaintiffs' practices:

> Evidently, [adherents of this scheme] were filing [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security interests in property.  These liens and judgments, accessible on financing statement forms, are easy to file.  Once registered, however, the fraudulent liens are very burdensome to remove.  For example, in a New Jersey incident, [one group] registered a fraudulent $ 14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using their "copyrighted" names in court papers and hearings . . . . [Adherents of this scheme]  have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments.  Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms. [These publications adhere] to the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." . . . Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008).  The Court notes its grave concern with the seeming tendency of the Marrakush Society, the Aboriginal Law Firm, M.K. and K.S. to legitimize themselves by: (a) numerous recordations of unidentified documents in various miscellaneous books maintained by the counties of New Jersey and Florida (and, perhaps, counties in other states); (b) production of homemade "apostilles" and solicitation of actual apostilles of unspecified documents; (c) assertions that the Plaintiffs' credentials are "on file" with this Court, see supra note 30; (d) the Plaintiffs' frequent addition of the phrase "all rights reserved" and a string of UCC numbers after stating their attributes in their federal court submissions, see, e.g., El. v. Cox, 09-3371, Docket Entry No. 1, at 4; El. v. Cox, 09-3372,

1169 (9th Cir. 2004) (animal, either individually or in groups, has no standing to sue in its own right, even to require that defendant would seek a hunting permit to kill them); <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378-79 (1992) (only actually existing associations have standing to sue as "persons," on *their own* right); <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975) (an organization may sue on *its own behalf* for injuries *it* has sustained as a juridical "person").

Therefore, in the event the Marrakush Society or the Aboriginal Law Firms does not exist as an actual for-profit or non-profit juridical entity, it cannot commence any legal action.  Similarly, in the event M.K., K.S. or Bey are not real natural persons but rather mere figments garnished with long attributes, no legal action could be initiated by them or for them.

Moreover, the Court is not required to guess the identity of a plaintiff, since Local Rule 10.1 requires that the initial pleading "shall state in the first paragraph the street and post office address of each named party to the case or, if the party is not a natural person, the address of its principal place of business." <u>See</u> Local Civil Rule 10.1(a).  A complaint that supplies a pseudonym for a party or a nonsensical address for that party (or for the party's counsel) does not meet these simple requirements and cannot be filed.

---

Docket Entry No. 1, at 7; <u>Marrakush Society v. Township of Willingboro</u>,  09-3503, Docket Entry No. 1-4, at 3; <u>Marrakush Society v. Burlington County Jail</u>,  09-3504, Docket Entry No. 1-4, at 3; <u>Marrakush Society v. Township of Mansfield</u>,  09-3505, Docket Entry No. 1-4, at 3; <u>Marrakush Society v. Township of Mount Laurel</u>,  09-3507, Docket Entry No. 1-4, at 2.); <u>see also</u> <u>infra</u>, the Aboriginal Law Firm Section (discussing the Aboriginal Law Firm's advertisement as to its willingness to complete UCC preprinted financing forms and perfect the resulting liens) and expressly warns the Plaintiffs against any misuse of the litigations at bar.

### D.    STANDING TO BRING A JUS TERTII CLAIM

Under the "next friend" doctrine, standing is allowed to a third person, so this third person could file and pursue a claim in court on behalf of someone who is unable to do so on his or her own. The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case or controversy" requirement set forth in the Article III of Constitution.  See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990).

The Whitmore Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (1) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he] seeks to litigate" (and it has been further suggested that a "'next friend' must have some significant relationship with the real party in interest"; and (2) "the 'next friend' must provide an adequate explanation--such as inaccessibility, mental incompetence, or other disability--why the real party in interest cannot appear on his own behalf to prosecute the action." Id. at 163-64; see also Gilmore v. Utah, 429 U.S. 1012 (1976) (recognizing the presence of due interest and significant relationship to confer jus tertii standing upon the mother of a prisoner); compare DeVetsco v. Horn, 53 F.3d 24, 27 (3d Cir. 1995) (denying jus tertii standing to the third persons for "failure to sustain their burden of establishing . . . mental incompetence [or] other disability on the part of [the allegedly injured party]").  The burden is on the "next friend" to justify his/her status and, thereby, to obtain the jurisdiction of the federal courts.  See Whitmore, 495 U.S. at 164.

Here, the Marrakush Society did not assert any facts qualifying it to bring jus tertii claims on behalf of M.K. or K.S., or Bey.   Similarly, the complaints are silent as to any basis for M.K.'s legal action on behalf of K.S. or Bey (and vice-versa).

E.    EFFECT OF RULES 18 AND 20

Among the cluster of the matters at bar, there are some actions which present the Court with numerous complaints, but suggest challenges to the same set of events, even though these challenges are set forth in terms describing these events from the points of view of different litigants.  In other matters currently before this Court, the are multiple complaints, each of which describes a different set of events that have no relation to each other.  Plus, there are many matters which present the Court with more than one complaint (and, occasionally, with up to fourteen different complaints): these multi-complaint submissions -- even if assessed with a presumption that each of these chains of complaints was intended to be a single set of pleadings -- set forth challenges to wholly unrelated events.

Hence, it appears plausible that the Plaintiff might be able to convert some of their submissions in valid joint pleadings under Rule 20.  On the other hand, it is self-evident that the bulk of the Plaintiffs' submissions cannot meet the joinder-of-defendants or the transactional-relation requirements of Rules 18 and 20.

Rule 20 provides that persons may join in one action as plaintiffs if:

(A)    they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B)    any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1).

"For courts applying Rule 20 and related rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" Hagan v. Rogers, 2009 U.S. App. LEXIS 13173, at *12 (3d Cir.

N.J. June 19, 2009) (quoting <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 724 (1966)).

Thus, it appears that M.K. and K.S. challenges to the same set of events might be brought jointly

under Rule 20.

Conversely, claims addressing unrelated events, be these claims jammed into a single set of

pleadings or spread among multiple complaints submitted for filing in the same matter, could satisfy

the requirements of Rules 18 and 20.  Rule 20(a)(2) of the Federal Rules of Civil Procedure limits

the joinder of defendants, and Rule 18(a) governs the joinder of claims.  <u>See</u> Fed. R. Civ. P. 18(a),

20(a)(2).  Rule 20(a)(2) provides:

> Persons . . . may be joined in one action as defendants if: (A) any right to relief is
> asserted against them jointly, severally, or in the alternative with respect to or arising
> out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2)(A) and (B).

Rule 18 (a) provides : "A party asserting a claim . . . may join, as independent or alternative

claims, as many claims as it has against an opposing party."  Fed. R. Civ. P. 18(a).  Wright &

Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the

analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more
> than one party on one or both sides of the action.  It is not concerned with joinder of claims,
> which is governed by Rule 18.  Therefore, in actions involving multiple defendants Rule 20
> operates independently of Rule 18 . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single
> action only if plaintiff asserts at least one claim to relief against each of them that arises out
> of the same transaction or occurrence and presents questions of law or fact common to all.

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, <u>Federal Practice & Procedure Civil 3d</u>

§1655; <u>see</u> <u>Neitzke v. Williams</u>, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted

by Rule 20 unless both commonality and same transaction requirements are satisfied).   Thus, the

plaintiff may not name more than one defendant in his original (or amended) complaint unless one

claim against each additional defendant is transactionally related to the claim against the first

defendant and involves a common question of law or fact.  See Fed. R. Civ. P. 20(a)(2).  That rule

applies with equal force to claims by prisoners and non-prisoners: as the United States Court of

Appeals for the Seventh Circuit recently explained, a prisoner may not join in one case all defendants

against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule

20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should
> not be joined with unrelated Claim B against Defendant 2.   Unrelated claims against
> different defendants belong in different suits, not only to prevent the sort of morass that [a
> multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the
> required filing fees - for the Prison Litigation Reform Act limits to 3 the number of
> frivolous suits or appeals that any prisoner may file without prepayment of the required fees.
> 28 U.S.C. § 1915(g) . . .
>
> A buckshot complaint that would be rejected if filed by a free person - say, a suit
> complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay
> a debt, and E infringed his copyright, all in different transactions - should be rejected if filed
> by a prisoner.

George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007).

Hence, the Plaintiffs' "buckshot" challenges (regardless of whether they are reduced to a

single complaint or compose a "set of pleadings," stitched together out of a string of complaints

submitted for docketing in a single matter) facially violate the requirements of Rules 18 and 20.

## F.   DUPLICATIVE ACTIONS

Where the plaintiff commences more than one action by submitting for filing his pleadings that are identical to each other in all substantive respects, the so-commenced actions are facially duplicative and offend the notion of judicial economy and are subject to disissal.

> The power of a federal court to prevent duplicative litigation is intended "to foster judicial economy and the 'comprehensive disposition of litigation,'" Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000) (quoting Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183 (1952)), and "to protect parties from 'the vexation of concurrent litigation over the same subject matter.'" Id. (quoting Adam v. Jacobs, 950 F.2d 89, 93 (2d Cir. 1991)).

Porter v. NationsCredit Consumer Disc. Co., 2003 Bankr. LEXIS 933, at *33 (Bankr. E.D. Pa. 2003).

Thus, all actions duplicative of the another matters already commenced are subject to administrative termination, without leave to reopen, regardless of whether the plaintiff duly pre-paid his filing fee or submit their valid in forma pauperis applications.

## G.   PLEADING REQUIREMENTS

The issue of pleading requirements was explained to the Plaintiffs, time and again, by the judges in the Southern District of Florida.  Indeed, the Court is deeply concerned with the fact that the Plaintiffs persist in their practice of submitting insufficient pleadings even after having the requirement clarified to them on five occasions.  Each of the pleadings currently before this Court violates the rules of pleading set forth in Rule 8 of the Federal Rules of Civil Procedure, which provides, in relevant part:

> A pleading that states a claim for relief must contain:
> (1)    a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2)    a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3)     a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

However, granting the Plaintiff the benefit of the doubt, the Court takes this opportunity to state, in great detail, the burden the Plaintiff must meet.

In determining the sufficiency of a complaint, the Court must be mindful to construe the facts stated in the complaint liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89 (2007); Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). Indeed, it is long established that a court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). However, while a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See id.  Last year, addressing the clarifications as to the litigant's pleading requirement stated in the United States Supreme Court in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Court of Appeals for the Third Circuit provided the courts in this Circuit with detailed and careful guidance as to what kind of allegations qualify as pleadings sufficient to pass muster under the Rule 8 standard.  See Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008).  Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' [by stating] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ."  Twombly, 127 S. Ct. at 1964-65 . . . Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  Id. at 1965 n.3. . . . "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must]

> possess enough heft to 'sho[w] that the pleader is entitled to relief.'" <u>Id.</u> at 1966.
> [Hence] "factual allegations must be enough to raise a right to relief above the
> speculative level." <u>Id.</u> at 1965 & n.3 . . . . [Indeed, it is not] sufficient to allege mere
> elements of a cause of action; instead "a complaint must allege facts suggestive of
> the proscribed conduct." <u>Id.</u>

<u>Id.</u> at 230-34 (original brackets removed).

This pleading standard was further refined by the United States Supreme Court in its recent decision

<u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009):

> [In any civil action, t]he pleading standard . . . demands more than an unadorned
> ["]the-defendant-unlawfully-harmed-me["] accusation. [<u>Twombly</u>, 550 U.S.] at 555
> . . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of
> the elements of a cause of action will not do." [<u>Id.</u>] at 555. Nor does a complaint
> suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."
> <u>Id.</u> at 557 . . . . A claim has facial plausibility [only] when the plaintiff pleads factual
> content . . . . <u>Id.</u> at 556. [Moreover,] the plausibility standard . . . asks for more than
> a sheer possibility that a defendant has acted unlawfully. <u>Id.</u> [Indeed, even w]here
> a complaint pleads facts that are "merely consistent with" a defendant's liability, [the
> so-alleging complaint still] "stops short of [showing] plausibility of 'entitlement to
> relief.'" <u>Id.</u> at 557 (brackets omitted). [A <u>fortiori</u>,] the tenet that a court must accept
> as true all of the allegations contained in a complaint is inapplicable to legal
> conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported
> by mere conclusory statements [,<u>i.e.</u>, by] legal conclusion[s] couched as a factual
> allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that
> [defendants] adopted a policy "'because of,' not merely 'in spite of,' its adverse
> effects upon an identifiable group." . . . . [W]e do not reject these bald allegations
> on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature
> of [these] allegations, rather than their extravagantly fanciful nature, that disentitles
> them to the presumption of truth. . . . [Finally,] the question [of sufficiency of]
> pleadings does not turn . . . the discovery process. <u>Twombly</u>, 550 U.S.] at 559 . . .
> . [The plaintiff] is not entitled to discovery [where the complaint alleges any of the
> elements] "generally," [<u>i.e.</u>, as] a conclusory allegation [since] Rule 8 does not
> [allow] pleading the bare elements of [the] cause of action [and] affix[ing] the label
> "general allegation" [in hope to develop facts through discovery].

<u>Iqbal</u>, 129 S. Ct. at 1949-54.

   Thus, if -- for instance -- M.K. wishes to assert that the defendants tried to kidnap or kill him,

or sexually assaulted him, M.K. has to state actual facts supporting *these* allegations. In contrast,

if M.K. merely asserts that he was ordered by a police officer to step out of the car, handcuffed, pat-frisked and taken to a police precinct, M.K. must correspond his legal claims to *these* facts and cannot "enhance" these facts by factless self-serving conclusions (or by use of poetic license) to claim that the police officer committed a sexual assault, or attempted to kidnap and to murder M.K.

Furthermore, the bulk of the Plaintiffs' complaints names -- either as the first defendant or as the only defendant -- a municipality or agency, or a supervising/executive official of that municipality or agency, without stating any facts showing the municipality or the official's personal involvement in the wrongs allegedly suffered by the Plaintiffs.   Such pleadings are facially insufficient.  See Iqbal, 129 S. Ct. 1937.  It is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory.  See id., see also Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.'"  Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be asserted through allegations of facts showing that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights.  See id.; Monell, 436 U.S. at 694-95 (1978); accord Iqbal, 129 S. Ct. at 1949-54.

Finally, the pleadings cannot be reduced to pages of obscurities or to incomprehensible strings of imaginary or foreign terms, or to a chain of riddles and euphemism requiring the Court to effectively compile its own private "dictionary" corresponding plain English to the litigant's puzzling parlance.  See Burks v. City of Philadelphia, 904 F. Supp. 421, 424 (E.D. Pa. 1995) ("Because this pleading represents a gross departure from both the letter and the spirit of Rule 8(a)(2) by failing to

contain a 'short and plain statement of the claim showing that the pleader is entitled to relief,' this court will strike the complaint in its entirety"); see also Carpenter v. Williams, 86 F.3d 1015 (10th Cir. 1996) (affirming the district court's dismissal of an incomprehensible complaint); Aaron v. Bob Evans Rest., 477 F. Supp. 2d 853 (N.D. Ohio 2007) (holding that, even under liberal notice pleading requirements of Fed. R. Civ. P. 8 and liberal perspective in which pro se complaints are read, the complaint failed to meet even minimum requirements of short and plain statement of claim showing entitlement to relief where the plaintiff stated that he was "discharged due to mind manipulation by friends of management and forced to not have employee meals reason be [sic.] because company ended meal plan also they yelled at me calling my name then keeping up loud noises trying to delute [sic.] my ability to adapt[,] also I have white family members who portraide [sic.] in this conspiracy to rape and sodomize my mind and body"); accord McNeil v. United States, 508 U.S. 106 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel").  Therefore, the Plaintiffs' pleadings, infused with actual and distorted Arabic terms, Hijri calendar, mile-long geographic designations composed out of Earth coordinates, sea levels and imaginary principalities, made-up terms and distorted English words fail to meet the requirements of Rule 8.  In light of the simple and clear English used by the speaker in the Aboriginal Law Firm's YouTube videos, released (according to the Aboriginal Law Firm's Ning webpage) in the Internet by M.K., the Court will deem the Plaintiffs fully capable of producing a document in clear plain English, free from any forms of "Marrakush"-style lingo.  This Court, consequently, gives the Plaintiffs its first and last warning that the Plaintiffs' further persistence in submitting obscure or incomprehensible pleadings will be deemed a mockery of the Court and, thus, construed as contempt of court and treated accordingly.

H.   INITIATION OF CRIMINAL PROSECUTION

The Plaintiffs' submissions made in this District and in its sister courts contain multitudes of "criminal complaint warrants," "civil action warrants," "color of law - misconduct complaints," etc., seeking the defendants' arrest.  Morever, the Plaintiffs' "cover letter" submitted in each of Bey Line of Cases expressly states that the Plaintiffs seek to initiate and to prosecute a criminal action against the defendants.  However, the Plaintiffs have no authority to do so.

A private plaintiff cannot commence a criminal prosecution because the "authority to initiate a criminal complaint rests exclusively with state and federal prosecutors."  See Collyer v. Darling, 98 F.3d 211, 222 (6th Cir. 1996); Mercer v. Lexington Fayette Urban County Gov't., 52 F.3d 325 (6th Cir. 1995); Forney v. Woodridge Hosp. & Johnson City Med. Ctr., 2005 U.S. Dist. LEXIS 37257, at *6 (E.D. Tenn. Sept. 14, 2005); see also United States ex rel. Savage v. Arnold, 403 F. Supp. 172 (E.D. Pa. 1975) (stating that a private party cannot, on his own, commence a criminal proceeding for failure to meet to comply with the requirements of Rules 3 and 4 of the Rules of Criminal Procedure and citing United States v. Blierley, 331 F. Supp. 1182 (W.D. Pa. 1971); Brown v. Duggan, 329 F. Supp. 207 (W.D. Pa. 1971); United States ex rel. Spader v. Wilentz, 25 F.R.D. 492 (D.N.J), aff'd, 280 F.2d 422 (3d Cir.), cert. denied 364 U.S. 875 (1960)).

Similarly, the Plaintiffs are without authority to any prosecute criminal charges, see, e.g., United States v. Jarvis, 560 F.2d 494, 497 (2d Cir. 1977); Pokalsky v. SEPTA, 2002 U.S. Dist. LEXIS 16175 (E.D. Pa. Aug. 28, 2002); In re Guyer, 1996 U.S. Dist. LEXIS 17807, at *1 (E.D. Pa. 1996); United States v. Leomporra, 1995 U.S. Dist. LEXIS 15007, at *1 (E.D. Pa. 1995); Figueroa v. Clark, 810 F. Supp. 613, 615 (E.D. Pa. 1992); Bryant v. City of Phila., 1990 U.S. Dist. LEXIS 7132, at *6 n.1 (E.D. Pa. 1990); Comer v. Philadelphia County, 1987 U.S. Dist. LEXIS 1775, at *4

(E.D. Pa. 1987); <u>Savage v. Arnold</u>, 403 F. Supp. 172, 174 (E.D. Pa. 1975); <u>United States v. Panza</u>,

381 F. Supp. 1133, 1134 (W.D. Pa. 1974), and -- in addition, this Court is without authority to do

so on Plaintiff's behalf, since

> [i]t is well established that private citizens can neither bring a direct criminal action
> against another person *nor can they petition the federal courts to compel the criminal
> prosecution of another person*.  <u>See</u> <u>Maine v. Taylor</u>, 477 U.S. 131, 137 (1986);
> <u>Heckler v. Chaney</u>, 470 U.S. 821, 832 (1985); <u>Leeke v. Timmerman</u>, 454 U.S. 83,
> 86-87 (1981); <u>United States v. General Dynamics Corp.</u>, 828 F.2d 1356, 1366 (9th
> Cir. 1987).  Accordingly, the district court [is obligated to] refus[e] fil[ing] criminal
> charges or . . . compel[ing] prosecution based on those charges.

<u>Ellen v. Stamm</u>, 1991 U.S. App. LEXIS 30558 (9th Cir. Dec. 19, 1991) (emphasis supplied), <u>cert.</u>

<u>denied</u>, <u>Montalvo v. Stamm</u>, 506 U.S. 1047 (1993).  Therefore, the Plaintiffs' already-made

submissions seeking the defendants' arrest and/or criminal prosecution will not be entertained.  The

Plaintiffs' future submissions to that effect will not be accepted.

## VI.   <u>GUIDANCE WITH RESPECT TO HABEAS ACTIONS</u>

As noted <u>supra</u>, there are two habeas actions commenced by M.K. pending before this Court,

both actions are bearing the caption <u>El. v. Cox</u>.  <u>See</u> <u>Habeas - I</u>, Civil Action No. 09-3372, and

<u>Habeas - II</u>, Civil Action No. 09-3371 and are largely identical.  Contrary to the statements made by

M.K. in the <u>in forma pauperis</u> applications he signed on behalf of the Marrakush Society (asserring

that M.K. is not imprisoned), M.K. asserts in his both habeas petitions that he is incarcerated and

seeks release from this alleged confinement pursuant to an unidentified jurisdictional basis.

The Clerk docketed the <u>Habeas -I</u> matters as an application submitted pursuant to 28 U.S.C.

§ 2241, and the <u>Habeas - II</u> matter as a Section 2254 application, <u>see</u> <u>id.</u>, which is understandable in

light of M.K.'s silence as to the jurisdictional basis for his applications and uncertainty as to M.K.'s

status as a pre-trial detainee or a convicted prisoner.  The Court, therefore, finds it useful to provide

M.K. with some guidance as to the proper form of a habeas application and the applicable filing fee requirement.[49]

### A.   "IN CUSTODY" REQUIREMENT

"[A] habeas petitioner [must] be 'in custody' under the conviction or sentence under attack at the time his petition is filed."  Maleng v. Cook, 490 U.S. 488, 490-91 (1989); see also Spencer v. Kemna, 523 U.S. 1, 7 (1998); Lee v. Stickman, 357 F.3d 338, 342 (3d Cir. 2004).  "The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty."  Hensley v. Mun. Court, 411 U.S. 345, 351 (1973).  Therefore, "its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate."  Id.

In Maleng, the Court explained that the term "custody" defines not only physical confinement, but also includes circumstances entailing such limitations on a person's liberty as those imposed during parole.  See Maleng, 490 U.S. at 491; see also Hensley, 411 U.S. 345 (habeas petitioner released on own recognizance, but who suffered restraints on freedom of movement not shared by public generally, meets the "in custody" requirement).  In contrast, "[e]xamples of 'collateral consequences' that do not render a petitioner in custody include the inability to obtain a

---

[49]  Unlike in the case of a civil complaint, the "revised [Habeas] Rule 3(b) requires the [C]lerk to file a petition, even though it may otherwise fail to comply with [Habeas] Rule 2.  The [R]ule . . . is not limited to those instances where the petition is defective only in form; the [C]lerk [is] also required . . . to file the petition even though it lack[s] the required filing fee or an in forma pauperis form." 28 U.S.C. § 2254, Rule 3, Advisory Committee Notes,  2004 Am. However, Section 1914, the filing fee statute, provides in relevant part that "the clerk of each district court shall require the parties instituting [a legal action on the basis of an] application for a writ of habeas corpus [to submit] the filing fee [of] $ 5." 28 U.S.C. § 1914(a).  Thus, the fact that the instant Opinion addresses some defects of M.K.'s Habeas - I and Habeas - II applications cannot excuse M.K. from either paying his filing fee or from submitting an application for leave to proceed in forma pauperis, including the certification required by Local Civil Rule 81.2(b).

license to engage in a particular profession, own or possess firearms, or hold public office."
Sherman v. People of State of Ill., 2006 U.S. Dist. LEXIS 2360 (N.D. Ill. Jan. 19, 2006)  (citations omitted); see also Birotte v. Sec'y for Dep't of Corr., 236 Fed. App'x 577 (11th Cir. 2007) (noting that petitioner "concedes that his sentence for carrying a concealed firearm has expired, and thus the collateral consequence of his prior conviction -- the removal order -- is insufficient to render him in custody for the purposes of § 2254(a)"); Broomes v. Ashcroft, 358 F.3d 1251, 1254 (10th Cir. 2004) (holding petitioner not "in custody" for habeas purposes when in federal immigration custody awaiting final removal determination and seeking to challenge conviction that served as basis for removal).  Thus, "even grievous collateral consequences stemming directly from a conviction cannot, without more, transform the absence of custody into the presence of custody for the purpose of habeas review."  Lefkowitz v. Fair, 816 F.2d 17, 20 (1st Cir. 1987); see also Torrey v. Estelle, 842 F.2d 234, 236 (9th Cir. 1988) ("In many cases, the determination that a particular consequence is 'collateral' has rested on the fact that it was in the hands of another government agency or in the hands of the defendant himself").

Here, the complaints submitted in the civil matters pending before this Court suggest that M.K., although being booked into the Burlington County Jail (when he is stopped by traffic police and determined to drive without a valid state-issued driver's license) is typically released, within a day or two at most, with a mere summons issued to him.[50]  If M.K. was already released at the time of M.K.'s submission of his Habeas - I  or Habeas - II applications, he was  not "in custody" within

---

[50]   It appears that, in "Marrakush" parlance, the term "summons" is typically substituted by "Fraudulent Security Instrument," see, e.g., Marrakush Society v. Township of Willingboro, 09-2522 (D.N.J.), Docket Entries Nos. 1-2, at 4; Docket Entry 1-3, at 17, hence suggesting that M.K., K.S. and Bey adhere to the "Redemptionist" theory described by the Court of Appeals for the Third Circuit in Monroe v. Beard, 536 F.3d 198.  See supra note 48.

the meaning 28 U. S. C. §§ 2254(a) and 2241(c)(3), and this Court has no jurisdiction over his habeas applications.

    **B.**    **EXHAUSTION REQUIREMENT**

    Even in the event M.K. is actually a prisoner in custody pursuant to a judgment entered by a state court (and, thus, his habeas petition should be construed as a Section 2254 application), M.K. must first "exhaust[] the remedies available in the courts of the State, [unless] there is an absence of available State corrective process[] or . . . circumstances exist that render such process ineffective." 28 U.S.C. § 2254(b)(1); Rose v. Lundy, 455 U.S. 509, 515 (1982); Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993); Duarte v. Hershberger, 947 F. Supp. 146 (D.N.J. 1996); see also Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001) (finding that "Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts"). The courts of a state must be afforded an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Wilwording v. Swenson, 404 U.S. 249, 250 (1971); Picard v. Connor, 404 U.S. 270, 275 (1971); Evans v. Court of Common Pleas, Del. Cty., Pa., 959 F.2d 1227, 1230 (3d Cir. 1992), cert. dismissed, 506 U.S. 1089 (1993).

    Thus, a petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in post-conviction proceedings. See Ross v. Petsock, 868 F.2d 639 (3d Cir. 1989); see also O'Sullivan v. Boerckel, 526 U.S. 838 (1999); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented").

The claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition, see Picard, 404 U.S. at 275, and reliance on the same constitutional provision is not sufficient: the legal theory and factual predicate must also be the same.  See id. at 277.  Where any available state court procedure remains for the applicant to raise the question presented in the courts of the state, the applicant has not exhausted the available remedies.  See 28 U.S.C. § 2254(c).  Federal courts have consistently adhered to the exhaustion doctrine "for it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation."  Picard, 404 U.S. at 275 (citations and internal quotation marks omitted).

Moreover, in the event M.K. is a pre-trial detainee (and, thus, his petition should be construed as a Section 2241 application, see Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973); Moore v. DeYoung, 515 F.2d 437, 442, 443 (3d Cir. 1975)), the exhaustion requirement applies to his petition with equal force.  Although Section 2241 petitioners are not statutorily required to exhaust state court remedies, "an exhaustion requirement has developed through decisional law, applying principles of federalism."  Moore, 515 F.2d at 442.  Thus, while the court has jurisdiction under § 2241 to entertain the in-custody petitioner's pretrial habeas petition, relief is not warranted where "federal habeas corpus does not lie, absent 'special circumstances,' to adjudicate the merits of an affirmative defense to state criminal charges prior to a judgment of conviction by a state court."  Braden, 410 U.S. at 489 (quoting Ex Parte Royall, 117 U.S. 241, 253 (1886)).  Thus, even if M.K. was "in custody" at the time he submitted his Habeas - I and Habeas - II petitions, these petitions are subject to dismissal for failure to exhaust unless M.K. duly exhausted them in all three levels of New Jersey court prior to submitting his instant habeas applications.

C.   PLEADING REQUIREMENTS AND ABUSE OF WRIT

While not subject to Rule 8 pleading requirements, habeas applications must meet the steep pleading requirements set forth in the governing Habeas Rules.  See McFarland v. Scott, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet *heightened* pleading requirements") (emphasis supplied).

A petition must "specify all the grounds for relief" and set forth "facts supporting each of the grounds thus specified."  See 28 U.S.C. § 2254, Rule 2(c) (amended Dec. 1, 2004, and applicable to § 2241 petitions through Habeas Rule 1(b)).  Moreover, even pro se habeas applications, which are construed liberally and with a measure of tolerance, see Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989), obligate the pro se litigant to prepare a "petition [which] substantially follow[s] either the [pre-printed habeas petition] form [distributed by the Clerk] or a form prescribed by a local district-court rule." 28 U.S.C. § 2254, Rule 2(c).  Here, it is self-evident that M.K.'s Habeas - I and Habeas - II applications (which do not specify any cognizable grounds for relief and substitute "facts supporting each of the grounds" with thirty-two paragraphs beginning with the word "fact" followed with nothing but irrelevant M.K.'s biographic information or expressions of M.K.'s views as to the ethnic status of American and non-American persons of color) fail to meet the heightened pleading requirements.

Moreover, M.K.'s filing of two virtually identical petitions, with only four days difference between these submissions, raises additional concerns based on the equitable doctrine of abuse of. the writ.  See Sanders v. United States, 373 U.S. 1, 17-19 (1963) (explaining that the concept of "abuse of. the writ" is founded on the equitable nature of habeas corpus. . . . Where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or *engages in*

*other conduct that disentitles him to the relief he seeks*, the federal court may dismiss the subsequent

petition on the ground that the prisoner has abused the writ") (emphasis supplied).

### D.   PROHIBITION AGAINST RECREATIONAL LITIGATION

The preceding point invites a brief discussion of the umbrella issue of recreational litigation.

A "recreational litigant" is the "one who engages in litigation as sport and files numerous complaints

with little regard for substantive law or court rules." Jones v. Warden of the Stateville Correctional

Ctr., 918 F. Supp. 1142, 1153 (N.D. Ill. 1995) (noting that, "[w]hen confronted with [a] recreational

plaintiff, courts, to protect themselves and other litigants, have enjoined the filing of further case

without leave of court" and citing In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley, 988

F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918 F.2d 560 (5th Cir. 1990)).

It is well within the broad scope of the All Writs Act, 28 U.S.C. § 1651(a), for a district court

to issue an order restricting the filing of meritless cases by a litigant whose manifold complaints aim

to subject defendants to unwarranted harassment, and raise concern for maintaining order in the

court's dockets. See e.g., In Re Oliver, 682 F.2d 443, 445 (3d Cir. 1982) (citing Lacks v. Fahmi, 623

F.2d 254 (2d Cir. 1980) (per curiam); Harrelson v. United States, 613 F.2d 114, 115 (5th Cir. 1980)

(per curiam); and Clinton v. United States, 297 F.2d 899, 901 (9th Cir. 1961), cert. denied, 369 U.S.

856, 82 S. Ct. 944, 8 L. Ed. 2d 14 (1962)).  The Court of Appeals for the Third Circuit guided that,

> [i]n appropriate circumstances, courts have gone beyond prohibitions against
> relitigation and enjoined persons from filing any further claims of any sort without
> the permission of the court.  In Rudnicki v. McCormack, 210 F. Supp. 905 (D. Mass.
> 1962), the court entered such an injunction after it found that, in the absence of a
> court-ordered proscription, a plaintiff who had "repeatedly filed groundless actions"
> against various state and federal officers will continue to institute groundless and
> purely vexatious litigation both against these defendants and against other judges and
> public officials, the effect of which will be to cause further harassment of these
> officials, further expense to the governments which they represent, and further

burden upon the offices of the clerks of the courts in which such proceedings are initiated.  Id. at 911.  See also Gordon v. U.S. Department of Justice, 558 F.2d 618 (1st Cir. 1977) (plaintiff enjoined from instituting suit against any state or federal judge, officer, or employee without permission of court); Green v. Wyrick, 428 F. Supp. 732 (W.D. Mo. 1976).

Oliver, 682 F.2d at 445.

In light of the Plaintiffs' commencement of nineteen actions in this District within the period of only fifty eight days (with some submissions containing of up to fourteen sets of pleadings per action), systemic duplication of pleadings, reduction of the pleadings to a mix of obscure, imaginary and foreign terms, and submission of piles and piles of meritless "warrants" and in forma pauperis application, which wholly ignore the guidance provided to the Plaintiffs by other federal judges, the Court notes that the Plaintiffs' litigation practices in this District have come dangerously close to earning the Plaintiffs an order of preclusion.  The Court, therefore, strongly urges the Plaintiffs to treat their future litigations in this District (and in other courts) with utmost seriousness.  This Court will not tolerate frivolous litigation that wastes judicial resources.  While the Court will give the Plaintiffs' instant applications the benefit of the doubt and will administratively terminate the actions commenced by the Plaintiffs with leave to have certain of these matters reopened upon submission of proper documents, as described infra, the Court -- from this point on -- will deem the Plaintiffs charged with knowledge of all legal guidance provided to the Plaintiffs in this Opinion and the guidance provided to the Plaintiffs by the judges in the Southern District of Florida.  The Court expressly warns the Plaintiffs that any future abuse of legal process (be it with regard the matters currently before the Court or with regard to any other action the Plaintiffs commence in this District) would trigger sanctions and/or an imposition of *severe* limitations on the ability to file a case in the future.

VII.    **CONCLUSION**

For the foregoing reasons all above-captioned actions will be administratively terminated, although some of these actions will be terminated with leave to reopen, subject to certain limitations detailed in the Order attached hereto.

An appropriate Order accompanies this Opinion.


 **s/ Jerome B. Simandle**_____
**Jerome B. Simandle**
**United States District Judge**

Dated: July 30, 2009